**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Deborah H. Renner
Email: drenner@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Jessie M. Gabriel
Email: jgabriel@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Jennifer A. Vessells
Email: jvessells@bakerlaw.com
Lauren M. Hilsheimer
Email: lhilsheimer@bakerlaw.com
Lindsey D'Andrea
Email: ldandrea@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA LIQUIDATION <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | **COMPLAINT** <br><br> **SECOND REDACTED VERSION** |

IRVING H. PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

      Plaintiff,                          Adv. Pro. No.

      v.

JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK, N.A., J.P. MORGAN
SECURITIES LLC, and J.P. MORGAN
SECURITIES LTD.,

      Defendants.

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ........................................................................................ 1

JURISDICTION AND VENUE ................................................................................... 6

PARTIES ...................................................................................................................... 6

    The Trustee ............................................................................................................ 6

    The Defendants ..................................................................................................... 8

MADOFF'S INVESTMENT ADVISORY, MARKET MAKING, AND
    PROPRIETARY TRADING BUSINESSES .......................................................... 11

SIPA LIQUIDATION ................................................................................................ 16

THE PLAYERS .......................................................................................................... 18

    Relevant JPMC Business Segments ................................................................... 18

    Relevant JPMC Divisions and Employees ........................................................ 19

    Relevant JPMC Committees ............................................................................... 21

    BLMIS Feeder Funds .......................................................................................... 22

    Other Relevant Entities ....................................................................................... 23

JPMC'S INVESTMENT IN BLMIS FEEDER FUNDS ........................................... 23

    JPMC's Note Program ........................................................................................ 23

    JPMC Starts Structuring and Issuing Products on BLMIS Feeder Funds ........... 25

    JPMC's Due Diligence Led to Unanswered, Disturbing Questions
        Regarding Madoff and His Investment Strategy ..................................... 26

    Undeterred by Failed Due Diligence, Equity Exotics Requests Approval
        from the Hedge Fund Underwriting Committee to Issue
        Approximately $1 Billion in BLMIS-Related Products ......................... 30

    The Investment Bank Continues to See Red Flags ............................................. 32

    Faced Again with Numerous Indications of Madoff's Fraud, JPMC
        Quietly Removes All of Its Assets from the BLMIS Feeder Funds ........ 39

    After the Fraud Was Revealed, JPMC Admitted Knowledge That Madoff
        Was a Fraud ............................................................................................. 41

JPMC'S "LESSONS LEARNED" .............................................................................. 44

JPMC'S VIEW OF MADOFF AS SEEN FROM ACCOUNT ACTIVITY ................. 47

    Madoff Finds a Banker to Assist Him in His Ponzi Scheme .............................. 47

    The Establishment of Madoff's Account ............................................................ 48

# TABLE OF CONTENTS
(continued)

**Page**

JPMC Had a Duty to Know Its Customer and to Monitor Its Customers'
Account Activity ................................................................ 49

JPMC Had a Duty to Know What Type of Business Madoff Was
Operating ........................................................................ 50

JPMC Ignored the Inconsistencies Between BLMIS's Financial
Statements, the Activity in the 703 Account, and BLMIS's
Purported Business ...................................................... 51

The FOCUS Reports Show BLMIS Underreported Cash at JPMC ........ 53

The FOCUS Reports Do Not Show JPMC's Loans to BLMIS .............. 54

The FOCUS Reports Underreport Loan Collateral ................................ 54

The FOCUS Reports Show Glaring Issues in BLMIS's Purported
Business ........................................................................ 55

JPMC Had a Duty to Monitor BLMIS's Account Activity ................................. 59

Account Activity Red Flags .......................................................... 61

JPMC Had a Duty to Investigate Suspicious Activity in BLMIS's Account ...... 64

JPMC Had a Duty to Take Action .................................................... 66

JPMC'S VIEW OF MADOFF THROUGH LOAN ACTIVITY .................................. 67

JPMC's Loans to Levy for BLMIS Investments ................................. 67

JPMC's Loans to BLMIS in 2005 and 2006 ...................................... 68

JPMC ALLOWED THE FRAUD TO CONTINUE ...................................... 71

THE TRANSFERS ...................................................................... 72

Direct Transfers to JPMC ............................................................ 72

Subsequent Transfers to the Defendants ............................................ 72

CAUSES OF ACTION .................................................................. 75

AS AND FOR A FIRST CAUSE OF ACTION
Preferential Transfers (Initial Transferee)—11 U.S.C. §§
547(b), 550(a), and 551 ............................................ 75

AS AND FOR A SECOND CAUSE OF ACTION
Fraudulent Transfers (Initial Transferee)—11 U.S.C. §§
548(a)(1)(A), 550(a), and 551 .................................... 76

AS AND FOR A THIRD CAUSE OF ACTION
Fraudulent Transfers (Initial Transferee)—11 U.S.C. §§
548(a)(1)(B), 550(a), and 551 .................................... 77

# TABLE OF CONTENTS
(continued)

Page

AS AND FOR A FOURTH CAUSE OF ACTION
 Fraudulent Transfers (Initial Transferee)—New York
 Debtor and Creditor Law §§ 276, 276-a, 278, and/or 279,
 and 11 U.S.C. §§ 544, 550(a), and 551........................................ 79

AS AND FOR A FIFTH CAUSE OF ACTION
 Fraudulent Transfers (Initial Transferee)—New York
 Debtor and Creditor Law §§ 273, 278, and/or 279, and 11
 U.S.C. §§ 544, 550(a), and 551.................................................. 80

AS AND FOR A SIXTH CAUSE OF ACTION
 Fraudulent Transfers (Initial Transferee)—New York
 Debtor and Creditor Law §§ 274, 278, and/or 279, and 11
 U.S.C. §§ 544, 550(a), and 551.................................................. 80

AS AND FOR A SEVENTH CAUSE OF ACTION
 Fraudulent Transfers (Initial Transferee)—New York
 Debtor and Creditor Law §§ 275, 278, and/or 279, and 11
 U.S.C. §§ 544, 550(a), and 551.................................................. 81

AS AND FOR AN EIGHTH CAUSE OF ACTION
 Recovery of All Fraudulent Transfers (Initial Transferee)—
 New York Civil Practice Law and Rules 203(g) and 213(8),
 New York Debtor and Creditor Law §§ 276, 276-a, 278,
 and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551.................... 82

AS AND FOR A NINTH CAUSE OF ACTION
 Preferential Transfers (Subsequent Transferee)—11 U.S.C.
 §§ 547(b), 550(a), and 551........................................................ 83

AS AND FOR A TENTH CAUSE OF ACTION
 Fraudulent Transfers (Subsequent Transferee)  11 U.S.C.
 §§ 548(a)(1)(A), 550(a), and 551................................................ 85

AS AND FOR AN ELEVENTH CAUSE OF ACTION
 Fraudulent Transfers (Subsequent Transferee) 11 U.S.C. §§
 548(a)(1)(B), 550(a), and 551..................................................... 86

AS AND FOR A TWELFTH CAUSE OF ACTION
 Fraudulent Transfers (Subsequent Transferee)—New York
 Debtor and Creditor Law  §§ 276, 276-a, 278, and/or 279,
 and 11 U.S.C. §§ 544, 550(a), and 551........................................ 88

AS AND FOR A THIRTEENTH CAUSE OF ACTION
 Fraudulent Transfers (Subsequent Transferee)—New York
 Debtor and Creditor Law §§ 273, 278, and/or 279, and 11
 U.S.C. §§ 544, 550(a), and 551.................................................. 89

# TABLE OF CONTENTS
(continued)

**Page**

AS AND FOR A FOURTEENTH CAUSE OF ACTION
Fraudulent Transfers (Subsequent Transferee)—New York
Debtor and Creditor Law §§ 274, 278, and/or 279, and 11
U.S.C. §§ 544, 550(a), and 551.................................................... 91

AS AND FOR A FIFTEENTH CAUSE OF ACTION
Fraudulent Transfers (Subsequent Transferee)—New York
Debtor and Creditor Law §§ 275, 278, and/or 279, and 11
U.S.C. §§ 544, 550(a), and 551.................................................... 92

AS AND FOR A SIXTEENTH CAUSE OF ACTION
Recovery of All Fraudulent Transfers (Subsequent
Transferee)—New York Civil Practice Law and Rules
203(g) and 213(8), New York Debtor and Creditor Law
§§ 276, 276-a, 278, and/or 279, and 11 U.S.C. §§ 544,
550(a), and 551 .......................................................................... 93

AS AND FOR A SEVENTEENTH CAUSE OF ACTION
Aiding and Abetting Fraud ........................................................... 95

AS AND FOR AN EIGHTEENTH CAUSE OF ACTION
Aiding and Abetting Breach of Fiduciary Duty............................ 99

AS AND FOR A NINETEENTH CAUSE OF ACTION
Conversion ................................................................................. 103

AS AND FOR A TWENTIETH CAUSE OF ACTION
Unjust Enrichment .................................................................... 104

AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
Fraud on the Regulator.............................................................. 105

Irving H. Picard ("Trustee"), as trustee for the substantively consolidated liquidation of

the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities

Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"), and the estate of Bernard L.

Madoff, by and through his undersigned counsel, as and for his Complaint against JPMorgan

Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan

Securities Ltd. (collectively, "JPMC" or "Defendants"), states as follows:

## <u>NATURE OF THE ACTION</u>

> *"'But the Emperor has nothing on at all!!!' said a little child."*

> Hans Christian Andersen, <u>The Emperor's New Clothes</u>

> *"For whatever it[']s worth, I am sitting at lunch with Matt Zames who
> just told me that there is a well-known cloud over the head of Madoff and
> that his returns are speculated to be part of a [P]onzi scheme."*

> John Hogan, Chief Risk Officer, Investment Bank, JPMC,
> June 15, 2007

1.      The story has been told time and time again how Madoff duped the best and the

brightest in the investment community.  The Trustee's investigation reveals a very different

story—the story of financial institutions worldwide that were keen to the likely fraud, and

decidedly turned a blind eye to it.  While numerous financial institutions enabled Madoff's fraud,

JPMC was at the very center of that fraud, and thoroughly complicit in it.

2.      JPMC was BLMIS's primary banker for over 20 years, and was responsible for

knowing the business of its customers—in this case, a very large customer.  JPMC is a

sophisticated financial institution, and it was uniquely situated to see the likely fraud.  Billions of

dollars flowed through BLMIS's account at JPMC, the so-called "703 Account," but virtually

none of it was used to buy or sell securities as it should have been had BLMIS been legitimate.

But if those large transactions that did not jibe with any legitimate business purpose triggered

1

any warnings, they were suppressed as the drive for fees and profits became a substitute for common sense, ethics and legal obligations.  It is estimated that JPMC made at least half a billion dollars in fees and profits off the backs of BLMIS's victims, and is responsible for at least $5.4 billion in damages for its role in allowing the Ponzi scheme to continue unabated for years, with an exact amount to be determined at trial.

3.      In addition to being BLMIS's banker, JPMC also profited from the Ponzi scheme by selling structured products related to BLMIS feeder funds to its clients.  Its due diligence revealed the likelihood of fraud at BLMIS, but JPMC was not concerned with the devastating effect of fraud on investors.  Rather, it was concerned only with its own bottom line, and did nothing but a cost-benefit analysis in deciding to become part of Madoff's fraud:  "Based on overall estimated size of BLM strategy, . . . it would take [a] . . . fraud in the order of $3bn or more . . . for JPMC to be affected."  JPMC also relied on the Securities Investor Protection Corporation ("SIPC") to protect its profits:  "JPMorgan's investment in BLM . . . is treated as customer money . . . and therefore [is] covered by SIPC."  By the Fall of 2008, in the midst of a worldwide economic downturn, the cost-benefit analysis had changed.  JPMC, no longer comfortable with the risk of fraud, decided to redeem its $276 million in investments in BLMIS feeder funds.  JPMC also received an additional $145 million in fraudulent transfers from BLMIS in June 2006.  The Trustee seeks the return of this money in this Action.

4.      JPMC allowed BLMIS to funnel billions of dollars through the 703 Account by disregarding its own anti-money laundering duties.  From 1986 on, all of the money that Madoff stole from his customers passed through the 703 Account, where it was commingled and ultimately washed.  JPMC had everything it needed to unmask the fraud.  Not only did it have a clear view of suspicious 703 Account activity, but JPMC was provided with Financial and

2

Operational Combined Uniform Single Reports ("FOCUS Reports") from BLMIS.  The FOCUS

Reports contained glaring irregularities that should have been probed by JPMC.  For example,

not only did BLMIS fail to report its loans from JPMC, it also failed to report any commission

revenue.  JPMC ignored these issues in BLMIS's financial statements.  Instead, JPMC lent

legitimacy and cover to BLMIS's operations, and allowed BLMIS to thrive as JPMC collected

hundreds of millions of dollars in fees and profits and facilitated the largest financial fraud in

history.

  5.  In addition to the information JPMC obtained as BLMIS's long-time banker,

JPMC also performed due diligence on BLMIS beginning in 2006, using information it obtained

from those responsible at JPMC for the 703 Account, as well as information provided by various

BLMIS feeder funds.  At some point between 2006 and the Fall of 2008, if not before, JPMC

unquestionably knew that:

  a.  BLMIS's returns were consistently too good—even in down markets—to

be true;

  b.  Madoff would not allow transparency into his strategy;

  c.  JPMC could not identify, and Madoff would not provide information on,

his purported over-the-counter ("OTC") counterparties;

  d.  BLMIS's auditor was a small, unknown firm;

  e.  BLMIS had a conflict of interest as it was the clearing broker, sub-

custodian, and sub-investment adviser;

  f.  feeder fund administrators could not reconcile the numbers they got from

BLMIS with any third party source to confirm their accuracy; and

g.      there was public speculation that Madoff operated a Ponzi scheme, or was engaged in other illegal activity, such as front-running.

6.      JPMC looked the other way, ignoring the warning signs, even in the aftermath of other well-known frauds.  In response to those who, prior to Madoff's arrest, found it "[h]ard to believe that [fraud] would be going on over years with regulators [sic] blessing," the Chief Risk Officer of JPMC's Investment Bank responded, "you will recall that Refco was also regulated by the same crowd you refer to below and there was noise about them for years before it was discovered to be rotten to the core."

7.      JPMC's due diligence team was further concerned about fraud at BLMIS in the wake of another well-known fraud, the Petters fraud.  Some of these concerns centered on BLMIS's small, unknown auditor, Friehling & Horowitz ("Friehling"):

> The "DD" [due diligence] done by all counterparties seems
> suspect.  Given the scale and duration of the Petters fraud it cannot
> be sufficient that there's simply trust in an individual and there's
> been a long operating history . . . . Let's go see Friehling and
> Horowitz the next time we're in NY . . . to see that the address
> isn't a car wash at least.

8.      In or about September 2008, as JPMC was re-evaluating its hedge fund investments in the midst of the worldwide financial crisis, Alain Krueger, of JPMC's London office, had a telephone call with individuals at Aurelia Finance, S.A. ("Aurelia Finance"), a Swiss company that purchased and distributed JPMC's structured products.  During the course of that call, the individuals at Aurelia Finance made references to "Colombian friends" and insisted that JPMC maintain its BLMIS-related hedge.  That conversation triggered a concern that Colombian drug money was somehow involved in the BLMIS-Aurelia Finance relationship, which led to an internal investigation at JPMC of BLMIS and Aurelia Finance for money

4

laundering. Significantly, it was only when its own money was at stake that JPMC decided to report BLMIS to a government authority.

9.      As reported in the French press, by the end of October 2008, JPMC admitted in a filing of suspicious activity made to the United Kingdom's Serious Organised Crime Agency ("SOCA") that it knew that Madoff was "too good to be true," and a likely fraud:

> (1) . . . [T]he investment performance achieved by [BLMIS's] funds . . . is so consistently and significantly ahead of its peers year-on-year, even in the prevailing market conditions, as to appear too good to be true—meaning that it probably is; and (2) the lack of transparency around Madoff Securities trading techniques, the implementation of its investment strategy, and the identity of its OTC option counterparties; and (3) its unwillingness to provide helpful information.

None of this information was new to JPMC—it had known it for years. It was only in an effort to protect its own investments that JPMC finally decided to inform a government authority about BLMIS. JPMC further sought permission from SOCA to redeem its Aurelia Finance-related investments and admitted that "as a result [of these issues with BLMIS] JPMC[] has sent out redemption notices in respect of one fund, and is preparing similar notices for two more funds."

10.     Incredibly, even when it admitted knowing that BLMIS was a likely fraud in October 2008, JPMC still did nothing to stop the fraud. It did not even put a restriction on the 703 Account. It was Madoff himself who ultimately proclaimed his fraud to the world in December 2008, and the thread of the relationships allowing the fraud to exist and fester began to be revealed as well. JPMC's complicity in Madoff's fraud, however, remained disguised, cloaked in the myth that Madoff acted alone and fooled JPMC. But that is the fable. What follows is the true story.

## JURISDICTION AND VENUE

11.     The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b) and 78fff-2(c)(3), §§ 105(a), 544, 547, 548(a), 550(a), and 551 of 11 U.S.C. §§ 101, *et seq.* ("Bankruptcy Code"), the New York Fraudulent Conveyance Act (New York Debtor and Creditor Law §§ 270, *et seq.* (McKinney 2001)), New York Civil Practice Law and Rules (McKinney 2001), and other applicable law.

12.     This is an adversary proceeding brought in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (BRL) ("SIPA Proceeding") is pending.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA §§ 78eee(b)(2)(A), (b)(4).

13.     This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (F), (H), and (O).

14.     Venue in this district is proper under 28 U.S.C. § 1409.

## PARTIES

### The Trustee

15.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code.  Chapters 1, 3, 5, and subchapters I and II of chapter 7 of the Bankruptcy Code are applicable to this case to the extent consistent with SIPA § 78fff-1(b).

16.     In addition to the powers of a bankruptcy trustee, the Trustee has broader powers granted by SIPA.

17.     The Trustee is a real party in interest and has standing to bring these claims pursuant to SIPA § 78fff-1 and the Bankruptcy Code, including §§ 323(b) and 704(a)(1), because, among other reasons:

6

a.    JPMC received "customer property" as defined in SIPA § 78*lll*(4) as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted" ("Customer Property");

b.    BLMIS incurred losses as a result of the conduct set forth herein;

c.    BLMIS customers were injured as a result of the conduct detailed herein;

d.    SIPC cannot by statute advance funds to the Trustee to fully reimburse all customers for all of their losses;

e.    the Trustee will not be able to fully satisfy all claims;

f.    the Trustee, as bailee of Customer Property, can sue on behalf of the customer-bailors;

g.    as of this date, the Trustee has received multiple, express assignments of certain claims of the applicable accountholders, which they could have asserted;

h.    as assignee, the Trustee stands in the shoes of persons who have suffered injury-in-fact, and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages;

i.    SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding.  SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

j.    the Trustee has the power and authority to avoid and recover transfers pursuant to §§ 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

7

**The Defendants**

18.     Defendant JPMorgan Chase & Co. ("JPMorgan Chase") is a financial holding company incorporated under Delaware law with its principal place of business at 270 Park Avenue, New York, New York 10017.  JPMorgan Chase is one of the largest banking institutions in the United States, with approximately $2.0 trillion in assets and $165.4 billion in stockholders' equity as of December 31, 2009.

19.     Upon information and belief, JPMorgan Chase played a role in the Defendants' relationship with BLMIS and the BLMIS feeder funds.  JPMorgan Chase created and implemented anti-money laundering policies that governed how the Defendants monitored the activity in the 703 Account.  Further, JPMorgan Chase was involved in the products the Defendants structured and issued relating to the BLMIS feeder funds and was repeatedly referenced in the term sheets for those products.

20.     Defendant JPMorgan Chase Bank, N.A. ("Chase Bank") is one of JPMorgan Chase's main bank subsidiaries and is organized under the laws of the United States with its principal place of business at 111 Polaris Parkway, Columbus, Ohio 43240.  Chase Bank is a national banking association in the United States with locations in 23 states, including a location in New York, New York.

21.     Upon information and belief, the Risk Management Division of the Investment Bank operates at least in part under the legal entity Chase Bank.  Chase Bank also acted as guarantor and common depository for products JPMC structured and issued related to the BLMIS feeder funds.

22.     Defendant J.P. Morgan Securities LLC  ("JPM Securities (US)") is the principal non-bank subsidiary of JPMorgan Chase and is organized under the laws of Delaware.  JPM Securities (US)'s operations are conducted in JPMorgan Chase's New York, New York offices.

8

JPM Securities (US) is JPMorgan Chase's United States Investment Banking arm, through which it conducts securities underwriting, dealing, and brokerage activities in the United States. JPM Securities (US) is registered with the Securities and Exchange Commission ("SEC") as an investment adviser and with the Financial Industry Regulatory Authority ("FINRA") as a brokerage firm.

23.     Upon information and belief, JPMorgan Chase's Financial Institutions Group and Broker/Dealer Group operate at least in part under the legal entity JPM Securities (US).

24.     Defendant J.P. Morgan Securities Ltd. ("JPM Securities (UK)") is organized under the laws of England with its registered office at 125 London Wall, London, EC2Y 5AJ. JPM Securities (UK) is JPMorgan Chase's United Kingdom Investment Banking arm, through which it conducts securities underwriting, securities dealing, and brokerage activities. JPM Securities (UK) is an indirect subsidiary of Chase Bank. JPM Securities (UK) routinely conducts business in New York, New York and its employees regularly work with JPMorgan Chase employees in the New York, New York offices and attend meetings at those offices.

25.     Upon information and belief, JPMorgan Chase's Equity Exotics & Hybrids Desk and the Equity Derivatives Group operate at least in part under the legal entity JPM Securities (UK). JPM Securities (UK) also played an integral role in structuring and issuing products related to the BLMIS feeder funds.

26.     This Court has personal jurisdiction over all of the Defendants captioned herein pursuant to New York Civil Practice Law and Rules 301 and 302, and Rule 7004 of the Federal Rules of Bankruptcy Procedure. All Defendants have maintained minimum contacts with New York in connection with the claims alleged herein.

27.     The Defendants have:  (a) intentionally taken full advantage of the rights, benefits, and privileges of conducting business and/or transactions in the State of New York; (b) purposefully availed themselves of the laws of the State of New York by undertaking significant commercial activities in New York, and by receiving Customer Property to their benefit; (c) derived significant revenue from New York; (d) maintained minimum contacts and/or general business contacts with New York in connection with the claims alleged herein; and (e) committed tortious acts both within and without New York, causing injury in New York, and (i) regularly do or solicit business or engage in a persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered in New York, or (ii) expect or should reasonably expect the acts to have consequences in New York and derive substantial revenue from interstate and international commerce.

28.     JPMorgan Chase operates six business segments:  Investment Banking, Commercial Banking, Treasury & Security Services, Asset Management, Retail Financial Services, and Card Services.  Within or alongside these various business segments, JPMorgan Chase's activities are further divided among numerous divisions and groups.

29.     JPMorgan Chase does not operate its various business segments, divisions, and groups within the confines of separate legal entities.  Rather, the firm operates through many legal entities under the enormous umbrella that is the financial holding company, JPMorgan Chase.

30.     Matt Zames, who heads Interest Rate Trading, Global Foreign Exchange, Public Finance, Global Mortgages, Tax-Oriented Investments, and Global Fixed Income, explained the significance of JPMorgan Chase's legal entities as "not relevant to how we run our business."

10

Zames used himself as an example:  "I guess I'm still an employee of [JPM Securities (US)].

Having said that, people that report to me are under [Chase Bank] as well."

31.     The Trustee brings this adversary proceeding against all Defendants because,

upon information and belief, each Defendant, individually, participated in, promoted, aided and

abetted the fraud.  In addition, all of the Defendants operated as a single indivisible entity.

Therefore, each of the Defendants is liable for the actions of the other Defendants.

## MADOFF'S INVESTMENT ADVISORY, MARKET MAKING, AND PROPRIETARY TRADING BUSINESSES

32.     BLMIS is a New York limited liability company that was wholly owned by

Madoff.  Founded in 1959, BLMIS operated from its principal place of business at 885 Third

Avenue, New York, New York.  Madoff, as Founder, Chairman, and Chief Executive Officer,

ran BLMIS together with several family members and a number of additional employees.

BLMIS was registered with the SEC as a securities broker-dealer under § 5(b) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78$o$(b).  By that registration, BLMIS became a member of

SIPC.  BLMIS had three business units:  market making, proprietary trading, and investment

advisory ("IA Business").  The IA Business was the locus of the fraud perpetrated by Madoff

through BLMIS.

33.     Madoff operated his fraudulent IA Business in the same BLMIS offices from

which he operated the market making and proprietary trading businesses.  BLMIS functioned

both as an investment adviser to its customers and a custodian of their securities.  Its annual

audits were purportedly performed by Friehling, an accounting firm of three employees, one of

whom was semi-retired, with offices located in a strip mall in Rockland County, New York.  The

precise date on which BLMIS began offering investment advisory services has not been

established, but it appears that BLMIS was offering such services as far back as the 1960s.  The

Trustee's investigation to date establishes that, to the extent records are available, BLMIS never acted as a true investment adviser in the interest of its customers.

34.     Madoff solicited billions of dollars from investors for his fraudulent IA Business. Initially, he told customers he would invest their funds pursuant to an arbitrage strategy. Then in the 1990s, Madoff purportedly began employing the Split Strike Conversion Strategy ("SSC Strategy"). Madoff represented that his strategy was to invest customer funds in a subset or "basket" of the common stocks that comprised the Standard & Poor's 100 Index ("S&P 100")—a collection of the 100 largest publicly traded companies. Madoff claimed that the baskets of stocks would mimic the movement of the S&P 100. He also asserted that he would carefully time purchases and sales to maximize value. Several times a year, customer funds would purportedly move "into the market," which consisted of allegedly purchasing a basket of stocks and corresponding option hedges. Then customer funds were moved completely "out of the market" to purported investments in United States Treasury Bills ("T-bills") or in mutual funds holding T-bills until the next presumed trading opportunity arose. At the end of most quarters, the baskets were purportedly sold and the proceeds invested in T-bills or other money market funds.

35.     As part of the SSC Strategy, Madoff also concocted a fictitious hedging strategy for the baskets of stocks. He purported to purchase and sell S&P 100 option contracts correlated to the stocks in the baskets, thereby limiting both the downside risk associated with possible adverse price changes in the baskets of stocks and the profits associated with increases in underlying stock prices. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options.

36.     The final customer statements issued by BLMIS for the month ending on November 30, 2008 falsely reflected that BLMIS's customers had nearly $65 billion of net investments and related fictitious gains from those investments.

37.     Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in—or had been traded through—their accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a complete fabrication.  The security purchases and sales depicted in the account statements virtually never occurred and the profits reported were entirely fictitious.  At his plea hearing, Madoff admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts.  Indeed, based on the Trustee's investigation to date and with the exception of isolated individual trades for certain clients, there is no record of BLMIS having cleared any purchase or sale of securities for customers of the IA Business at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have reasonably traded securities.

38.     Madoff generally assured customers and regulators that he purchased and sold the put and call options OTC rather than through an exchange.  Yet, like the underlying securities, the Trustee has yet to uncover any evidence that Madoff ever purchased or sold any of the options described in customer statements.  The Options Clearing Corporation, which clears all exchange-traded option contracts based upon the stock of S&P 100 companies, has no record of the IA Business having bought or sold any exchange-listed options on behalf of the IA Business customers.

39.     To bolster that lie, Madoff periodically wired hundreds of millions of dollars from the 703 Account to BLMIS's affiliate, Madoff Securities International Ltd. ("MSIL"), a London-based entity substantially owned by Madoff and his family.  There is no record that MSIL ever used the wired funds to purchase securities for the accounts of the IA Business clients.  In fact, MSIL wired hundreds of millions of dollars back into the bank accounts of BLMIS's proprietary trading and market making businesses in an attempt to create a record of revenues purportedly related to the SSC Strategy trades in Europe.

40.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and Madoff concealed the ongoing fraud in an effort to hinder and delay other current and prospective customers of BLMIS from discovering the fraud.  The money received from investors was overwhelmingly used to make the distributions to—or payments on behalf of—other investors, and to make other transfers, all of which are avoidable by the Trustee.  The money sent to BLMIS for investment, in short, was simply used to keep the operation going and to enrich Madoff, his associates, his family, and others, including JPMC, until such time as the requests for withdrawals in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

41.     During the scheme, certain investors requested and received distributions of the "profits" listed for their accounts that were nothing more than fictitious profits.  Other investors, from time to time, redeemed or closed their accounts, or removed portions of the purportedly available funds, and were paid consistently with the statements they had been receiving.  Some of those investors later re-invested part or all of those withdrawn payments through BLMIS.

42.     The falsified monthly account statements reported that the accounts of IA Business customers had made substantial gains, but in reality, because it was a Ponzi scheme,

BLMIS did not have those gains to pay investors. BLMIS was only able to survive for as long as it did by using the stolen principal invested by some customers to pay other customers.

43.     The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud. The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors, and to lure other investors into the Ponzi scheme.

44.     In an effort to hinder, delay, or defraud authorities from detecting the fraud, BLMIS did not register as an Investment Adviser, pursuant to 15 U.S.C. § 80b-3, until August 2006. This allowed BLMIS to avoid scrutiny from the SEC that may have uncovered the true dealings of BLMIS, exposing the billions of dollars that flowed into the company that Madoff used as his personal piggy bank.

45.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

46.     In or about January 2008, BLMIS filed with the SEC an Amended Uniform Application for Investment Adviser Registration. The application represented, among other things, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion. In actuality, in January 2008, BLMIS had 4,900 active customer accounts and purported assets under management of approximately $65 billion.

47.     Based upon the Trustee's ongoing investigation, it appears there were more than 8,000 customer accounts at BLMIS over the life of the Ponzi scheme. In early December 2008,

BLMIS generated account statements for its approximately 4,900 open customer accounts. In total, these statements showed that BLMIS customers had approximately $65 billion invested through BLMIS.  In reality, BLMIS had assets on hand worth a fraction of that amount, most of which JPMC held in the 703 Account.  Customer accounts had not accrued any real profits because no investments were ever made.  By the time the Ponzi scheme came to light on December 11, 2008, investors had lost nearly $17.1 billion in principal.

### SIPA LIQUIDATION

48.    On December 11, 2008 ("Filing Date"), Madoff was arrested by the Federal Bureau of Investigation for violations of the criminal securities laws, including, *inter alia,* securities fraud, investment adviser fraud, and mail and wire fraud, and was criminally charged with operating a multi-billion dollar securities fraud scheme in violation of 15 U.S.C. §§ 78j(b) and 78fff and 17 C.F.R. § 240.10b-5, in the United States District Court for the Southern District of New York (the "District Court"), captioned *United States v. Madoff*, Case No. 08-MJ-2735. On that same date, the SEC filed a complaint in the District Court against Madoff and BLMIS, Case No. 08-CV-10791, alleging that Madoff and BLMIS engaged in fraud through the IA Business.

49.    On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia,* BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.  On that same date, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to combine its own action with SIPC's application.

50.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

       a.      appointed the Trustee for the liquidation of the business of BLMIS

pursuant to SIPA § 78eee(b)(3);

       b.      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to

SIPA § 78eee(b)(3); and

       c.      removed the case to this Bankruptcy Court pursuant to SIPA

§ 78eee(b)(4).

51.     By orders dated December 23, 2008 and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person.

Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

52.     At a plea hearing on March 12, 2009 in the case captioned *United States v.

Madoff*, Case No. 09-CR-213 (DC), Madoff pled guilty to an eleven-count criminal information

filed against him by the United States Attorney's Office for the Southern District of New York.

Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of

[BLMIS]." (Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff*, No. 09-CR-

213 (DC) (S.D.N.Y. March 12, 2009) (Dkt. No. 50).)  Additionally, Madoff asserted: "[a]s I

engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." (*Id.*)  Madoff was

sentenced on June 29, 2009 to 150 years in prison.

53.     On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to

participating in and conspiring to perpetuate the Ponzi scheme.  At a plea hearing on August 11,

2009 in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS), DiPascali pled

guilty to a ten-count criminal information.  DiPascali admitted, among other things, that Madoff

had been operating a Ponzi scheme since at least the 1980s.  (Plea Allocution of Frank DiPascali

at 46, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (Dkt. No.

11).)

54.     By virtue of his appointment under SIPA, the Trustee has the responsibility to

recover and pay out Customer Property to BLMIS customers, assess claims, and liquidate any

other assets of BLMIS for the benefit of the estate and its creditors.  The Trustee is in the process

of marshalling BLMIS's assets, but such assets will not be sufficient to fully reimburse BLMIS

customers for the billions of dollars they invested through BLMIS.  Consequently, the Trustee

must use his broad authority as expressed and intended by both SIPA and the Bankruptcy Code

to pursue recovery for the victims of Madoff's fraud.

## THE PLAYERS

### Relevant JPMC Business Segments

55.     JPMorgan Chase operates six business segments:  Investment Banking,

Commercial Banking, Treasury & Security Services, Asset Management, Retail Financial

Services, and Card Services.  At least two of these six business segments, Investment Banking

and Asset Management, played a role in JPMC's relationship with Madoff and BLMIS.

56.     *Investment Banking*.  JPMC's Investment Bank services corporations, financial

institutions, governments, and institutional investors in the areas of corporate strategy and

structuring, capital-raising, risk management, market making, prime brokerage, and research.

57.     The Investment Bank was integral to fostering the relationship between JPMC

and BLMIS.  Multiple divisions within the Investment Bank were responsible for servicing and

maintaining the 703 Account, structuring and issuing products related to BLMIS feeder funds,

and assessing both the market and credit risks associated with BLMIS and BLMIS feeder funds.

58.     *Asset Management*.  Asset Management provides wealth management services to

institutions, high net worth individuals, and retail investors.  JPMC's Private Bank operates

through the Asset Management business segment.  The Private Bank decided not to conduct

business with BLMIS or BLMIS feeder funds after performing due diligence.

**Relevant JPMC Divisions and Employees**

59.     *Equity Exotics & Hybrids Desk.*  The Equity Exotics & Hybrids Desk ("Equity

Exotics") is the division within JPMC's Investment Bank that was primarily responsible for

structuring and issuing products related to BLMIS feeder funds.  An "exotic" is any investment

that is more complicated than simply buying a basket of stocks.  Upon information and belief,

Equity Exotics operates primarily out of JPMC's London office, and its members are employed

by JPM Securities (UK).

60.     Jonathan "Bobby" Magee ran Equity Exotics during 2007 and 2008 when the

group was structuring and issuing products related to BLMIS feeder funds.  Andrea De Zordo,

Neil McCormick, and Dimitrios Nikolakopoulos all worked at Equity Exotics under Magee's

leadership.  While McCormick and Magee are no longer employed by JPMC, De Zordo and

Nikolakopoulos continue to work for JPMC.

61.     *Financial Institutions Group and Broker/Dealer Group.*  JPMC's Financial

Institutions Group ("FIG") is a division of the Investment Bank responsible for servicing banks,

insurance companies, financial companies, and broker-dealers.  The Broker/Dealer Group is a

sub-division of FIG that works out of JPMC's New York, New York offices, and is responsible

for managing the Investment Bank's relationship with clients that are broker-dealers.  The

Broker/Dealer Group was responsible for managing the 703 Account and for providing credit to

BLMIS.

62.     Jane Buyers-Russo was head of the Broker/Dealer Group until her departure from

JPMC in 2010.  Richard Cassa, also a former employee, was the Client Relationship Manager in

the Broker/Dealer Group responsible for BLMIS's accounts and credit requests. He also fielded

requests from other divisions of JPMC to set up meetings with Madoff.

63.    *Equity Derivatives Group.* JPMC's Equity Derivatives Group ("EDG") provides

equity financing and structured financing for its investors, including loans, exchange-traded

funds, swaps, synthetic futures, and OTC options. EDG is part of the Investment Bank.

64.    Luke Dixon, a former JPMC employee, was an Executive Director in EDG and

worked out of JPMC's London office. Scott Palmer worked alongside Dixon in EDG in London.

Dixon and Palmer conducted due diligence on the BLMIS feeder funds in 2008.

65.    *Risk Management Division.* The Risk Management Division consists of

approximately 940 individuals that manage both market risk and credit risk at the Investment

Bank. The market risk sub-division assesses the riskiness of certain fund strategies, financial

products, and securities, and assures that JPMC's financial exposures stay within internal risk

guidelines. Credit risk manages the creditworthiness of transaction counterparties.

66.    John Hogan is the current Chief Risk Officer at JPMC's Investment Bank. He

works primarily out of the New York offices.

67.    Brian Sankey is Chief Credit Officer and Deputy Chief Risk Officer and is

currently responsible for all Credit Risk Management activities. Sankey reports directly to

Hogan. Marco Bischof and James Coffman also work in Credit Risk Management. Andrew Cox

works out of London in Global Credit Risk and Client Operations for Europe, the Middle East,

and Africa.

68.    Richard Wise and Chen Yang work in Market Risk Management in New York,

New York. Wise is the Head of Market Risk in the Equity Division, and Yang reports to Wise.

69.     These teams from credit risk and market risk, along with Hogan, reviewed and approved JPMC's structured products related to the BLMIS feeder funds.

70.     *Other Relevant Players.*  Other key individuals include Matt Zames, who heads Interest Rate Trading, Global Foreign Exchange, Public Finance, Global Mortgages, Tax-Oriented Investments, and Global Fixed Income at JPMC's Investment Bank.  Zames works in JPMC's New York, New York offices.  Zames told Hogan in 2007 that Madoff was rumored to be operating a Ponzi scheme.

71.     Carlos Hernandez is the Head of Global Equities at JPMC's Investment Bank. Hernandez works in JPMC's New York, New York offices, but runs JPMC's equity divisions in a number of different countries.  Hernandez was involved in reviewing and approving the proposal regarding JPMC's structured products related to BLMIS feeder funds.

72.     Alain Krueger worked in the Structured Investments Distribution Marketing division of JPMC's Investment Bank.  Krueger worked out of JPMC's London office.  He was the JPMC representative who spoke to Aurelia Finance regarding JPMC's decision to redeem from the BLMIS feeder funds.

73.     Michael Cembalest is a Chief Investment Officer at J.P. Morgan Global Wealth Management, which is part of the Private Bank.  Cembalest works out of JPMC's New York, New York offices.  Cembalest's group conducted due diligence on BLMIS and, after seeing all of the red flags, chose not to invest with any BLMIS feeder funds.

**Relevant JPMC Committees**

74.     *Hedge Fund Underwriting Committee.*  The Hedge Fund Underwriting Committee ("HFUC") was a committee at JPMC comprised of senior business heads and bankers, including individuals such as the Chief Risk Officer and the Heads of Equities, Syndicated Leveraged Finance, Sales, and Hedge Funds.  The purpose of the HFUC was to

ensure all senior partners who dealt with hedge funds were comfortable with proposals relating to hedge funds. The HFUC was presented with Equity Exotic's proposal to structure and issue products around the BLMIS feeder funds. The HFUC has since dissolved.

75.    *Investment Bank Risk Committee.*  JPMC's Investment Bank Risk Committee ("IBRC") meets weekly to discuss the universe of risk within the Investment Bank. The IBRC discusses activity in the markets, policy issues, operational issues, legal issues, and the Investment Bank's reputation. IBRC also received and reviewed the proposal by Equity Exotics.

**BLMIS Feeder Funds**

76.    *Fairfield Sentry and Fairfield Sigma.*  Both Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Fairfield Sigma") are funds run by the Fairfield Greenwich Group ("FGG"). Fairfield Sentry was among BLMIS's largest feeder funds. Fairfield Sigma invested all of its funds in Fairfield Sentry. JPMC invested in both of these funds in hedging its structured product exposure, and redeemed its interest in both funds the month before Madoff was arrested.

77.    *Herald.*  Herald Fund s.p.c. ("Herald") was a BLMIS feeder fund managed by Herald Asset Management. However, day-to-day management was delegated under a service agreement to Bank Medici AG ("Bank Medici"). The founder and majority shareholder of Bank Medici was Sonja Kohn, who was not only a longtime friend of Madoff, but also played a key role in the fraud herself. JPMC purchased an interest in Herald as part of its hedging strategy and redeemed that interest prior to Madoff's arrest.

78.    *Lagoon.* Lagoon Trust Limited ("Lagoon") was another fund that fed money to BLMIS. Hermes Asset Management Limited ("Hermes") managed Lagoon. JPMC also invested in Lagoon to hedge its exposure to the fund's returns.

79.    *Rye Funds*.  Rye Select Broad Market Portfolio Limited and Rye Select Broad

Market Fund ("Rye Funds") were two funds that fed money to BLMIS and were managed by

Rye Investment Management, a division of Tremont Partners Inc. ("Tremont").  Equity Exotics

requested hundreds of millions of dollars worth of products structured around the Rye Funds.

That transaction was never approved.

80.    *Thema*.  Thema International Fund plc ("Thema") was a BLMIS feeder fund

managed by Bank Medici.  Equity Exotics's proposal included an investment in Thema, but the

investment was not approved.

**Other Relevant Entities**

81.    *Aurelia and Aurelia Finance.*  Aurelia Fund Management Limited ("Aurelia"), a

company incorporated in Bermuda, owned 25% of Hermes and provided Hermes with necessary

office facilities, equipment, and personnel to enable Hermes to carry out its investment

management function.  Aurelia Finance, the Swiss company that purchased and distributed

JPMC's structured products, is the parent company of Aurelia.

82.    *Rafale Partners.*  Rafale Partners Inc. ("Rafale Partners") was a fund that invested

in two BLMIS feeder funds.  Stated differently, Rafale Partners was a sub-feeder fund into

BLMIS.  Equity Exotics's proposal included an investment in Rafale Partners, but that

investment was never approved.

**JPMC'S INVESTMENT IN BLMIS FEEDER FUNDS**

**JPMC's Note Program**

83.    In or about 2006, JPMC began considering various BLMIS feeder funds for the

purpose of structuring and issuing its own financial products based on those funds.

23

84.     JPMC started by gathering information on Fairfield Sentry and Lagoon.  By

February of 2006, JPMC had already visited FGG in connection with due diligence.  After the

visit, Yang wrote:

> I do have a few concerns and questions:  1) All trades are
> generated by Madoff's black box trading model and executed by
> Madoff.  It's not clear whether FFG has any discretion or control
> over the autopilot trading program. . . . 2) Is it possible to get some
> clarification as to how the fund made money during times of
> market distress? . . . how did they manage to get better than 3M T-
> Bill returns? . . . For example, from April to September 2002, the
> S&P 100 Index is down 30%, cash yielded 1%, and the Fund was
> able to generate over 6% returns.

85.     Yang was told during the same due diligence visit that FGG would not provide a

copy of Fairfield Sentry's trading agreement with BLMIS.  Yang therefore relied solely on a

verbal description of the investment guidelines and restrictions FGG had agreed upon

contractually with BLMIS.

86.     De Zordo and Bischof noted similar concerns with respect to Lagoon, Hermes,

and Aurelia.  Bischof was surprised by the absence of a proper legal relationship between

BLMIS and Hermes, and wrote to De Zordo on November 11, 2006:  "What continues to

surprise me is the fact that after their 14 years in the business and $1.5bn AUM, we seem to be

the first 'investor' spotting this lack of documentation around Lagoon and it's [sic]

upstream/downstream relationships."  De Zordo responded that the key question was whether

JPMC as a firm should even be doing business with Hermes and Aurelia.

87.     About a week later, Bischof followed up with De Zordo after a call with Aurelia.

He wrote:  "They have position level transparency once a month with 1 week delay, but don't

run risk analysis and don't have the know-how of how to do this. . . . It doesn't look pretty."

88.     JPMC already knew the identity of BLMIS's auditor, Friehling, and had known

the identity of the auditor for years.  But, upon information and belief, it was not until early 2006

that JPMC performed even minimal due diligence on Friehling.  Coffman noted that "a quick check found that they [Friehling] are not registered [sic] with the Public Company Accounting Oversight Board, nor are they subject to peer reviews from the American Institute of Certified Public Accountants.  Additionally, they have no website to provide background on their organization."

89.     Despite their suspicions, by early 2007, JPMC was exploring deals with other BLMIS feeder funds—the Rye Funds and Thema.

90.     JPMC was eager to begin issuing securities on BLMIS feeder funds.  After conducting only preliminary due diligence on these funds, and documenting concerns and red flags related to BLMIS and these feeder funds, JPMC started structuring and issuing products tied to these feeder funds' returns.

**JPMC Starts Structuring and Issuing Products on BLMIS Feeder Funds**

91.     By February 2007, JPMC already had over $65 million in BLMIS-related products in the pipeline.  These products included a €5 million trade on Fairfield Sigma, two $25 million trades tied to Fairfield Sentry, and a $10 million trade on Thema.

92.     These products were developed by Equity Exotics.  The majority of these products were structured to allow investors to collect returns tied to the returns of the BLMIS feeder funds.  Investors typically leveraged their investments in order to reap greater rewards from a smaller investment.  For example, in February 2007, JPMC was in the process of structuring a three-times leveraged certificate on Fairfield Sigma that would utilize borrowed funds to increase the amount invested.  An investor who purchased a three-times leveraged certificate would effectively invest $100, and then JPMC would lend an additional $200 and invest the entire $300 in the agreed upon BLMIS feeder fund.  This allowed the individual

investors to earn returns as if they had actually invested $300, despite only providing $100 of their own money.

93.    JPMC continued to structure additional BLMIS-related products during the Spring of 2007.  In March 2007, JPMC personnel were determining terms for deals on Fairfield Sentry, Fairfield Sigma, Herald, the Rye Funds, and Thema.

94.    On March 9, 2007, the BLMIS deals JPMC had in its pipeline totaled almost $100 million.  And by March 19, 2007, JPMC was considering another deal with the Rye Funds that would have increased the value of JPMC's BLMIS-related products by $200 - $300 million.

**JPMC's Due Diligence Led to Unanswered, Disturbing Questions Regarding Madoff and His Investment Strategy**

95.    In 2007, with hundreds of millions of dollars in deals ready to close, JPMC needed to get more comfortable with its exposure to Madoff.  JPMC needed to conduct additional due diligence on each of these BLMIS feeder funds and, most importantly, on BLMIS directly.  On February 15, 2007, Coffman wrote, "I would classify [BLMIS feeder funds] as a single fund, and therefore assume it falls under the $100mm limit . . . . Without actually getting to do due diligence on Madoff, I don't think we should consider going above that limit."

96.    Equity Exotics started by looking within its own company.  Madoff and his family had maintained numerous accounts at JPMC or its predecessors since as far back as 1986.  As Equity Exotics was in the midst of structuring hundreds of millions of dollars of BLMIS-related products, it contacted BLMIS's Client Relationship Manager in the Broker/Dealer Group, Cassa. Cassa offered to arrange a conference call between representatives of the Investment Bank and Madoff.  On March 30, 2007, Cassa and members of JPMC's Risk Management Division spoke with Madoff.

97.    Even though the products JPMC was structuring would have led to increased investments in the BLMIS feeder funds, and therefore increased investments through BLMIS, Madoff explained that he disliked banks structuring products on his strategy.  In particular, he made clear that he was not willing to engage in "full due diligence."  Despite the potential benefit for BLMIS of growing its customer base, Madoff could not risk engaging in due diligence that would disclose the fraud.

98.    Having learned relatively little from speaking to Madoff, Equity Exotics reached out to the BLMIS feeder funds themselves to obtain additional information regarding the funds and BLMIS.

99.    JPMC began its investigation with Tremont.  On April 11, 2007, representatives of JPMC met with Tremont's Chief Executive Officer, Bob Schulman, to discuss the Rye Funds and BLMIS.  Shortly after the meeting, JPMC sent Tremont a list of additional questions regarding BLMIS.  A number of these questions related to the counterparties to BLMIS's OTC options trading.  JPMC asked whether BLMIS entered into the trading agreements on behalf of Tremont or in BLMIS's own name, and whether Tremont knew who the counterparties were. JPMC received a response which required more diligence.  Tremont responded that, even though Tremont was the party entering into these agreements with the options counterparties, it did not know who the counterparties were.  Upon information and belief, JPMC never verified any of Tremont's responses with third parties, or questioned the source of Tremont's information regarding the counterparties.

100.    Based on the limited due diligence JPMC performed on BLMIS through Tremont, Equity Exotics put together a "Transaction Approval Package."  In addition to seeking approval for a number of different transactions involving the Rye Funds, the proposal summarized

27

JPMC's due diligence. "We will be receiving full transparency on the program via trade statements from BLM, albeit on a delayed basis, and will be able to verify our risk analysis on an ongoing basis," Equity Exotics claimed, and "[t]he liquidity of the underlying portfolio, even assuming close to $15 billion in 'AUM' [assets under management] at Madoff, should be adequate to fully unwind the program without catastrophic slippage." The risk involved was noted and quickly dismissed based on nothing more than Madoff's reputation:

> Although SIPC, SEC and NASD [National Association of Securities Dealers] regulation on segregated customer accounts should protect us from financial distress at BLM, it would not necessarily protect us from wholesale malfeasance or fraud. That said, BLM has had a successful operating history for nearly 50 years and Bernie Madoff is [a] well regarded figure in this industry.

101.    JPMC received similar responses to questions posed to Herald regarding counterparties: (a) the trades were between the fund and the counterparty, not between BLMIS and the counterparty; (b) the fund received collateral from all counterparties "except from very few high quality parties"; and (c) "the fund trades with say 10+names at any moment in time," but Madoff was not willing to disclose the actual names of the counterparties.

102.    Tremont's and Herald's responses were particularly alarming given Madoff was purportedly entering into OTC agreements with the options counterparties on behalf of the funds. Thus, Tremont and Herald, and, upon information and belief, all of the other BLMIS feeder funds, were supposedly entering into contracts with third parties that they could not even identify, much less assess counterparty creditworthiness.

103.    Again, despite alarming answers from Herald, Equity Exotics put together another "Transaction Approval Package" entitled "Bank Medici AG—an access provider into the Bernie Madoff strategy." As key transaction strengths, Equity Exotics listed: "multiple layers of oversight—although relying solely on Madoff for position level information, independent

weekly and monthly valuations are carried out by Bank Medici and the third party

Administrator," and "[p]ersonal relationship with Sonja Kohn," "[a]ccess to as secretive a

business as Madoff's, and the loyalty he presumably he [sic] feels towards her adds significant

comfort."  Key transaction weaknesses included that "investors, sub-Custodians, auditors etc rely

solely on Madoff produced statements and have no real way of verifying positions at Madoff

itself," and "[f]raud—given the significant reliance on BLM for verification of assets held, and

no real way to confirm those valuations, fraud presents a material risk."

104.    JPMC representatives also visited Rafale Partners and Bank Medici, and were

able to review BLMIS feeder funds' customer, option, and trading agreements.  Through that

review, JPMC learned that only certain feeder funds had agreements that explained BLMIS's

trading strategy.  JPMC suggested that the BLMIS feeder funds may be hesitant to press for

more details because they did "not want to upset the relationship with Madoff."

105.    JPMC did not put its securities activities on hold to conduct due diligence on the

funds.  Rather, at the same time it was conducting these investigations, Equity Exotics was

structuring additional BLMIS-related products with little to no regard for the disturbing

information learned through its due diligence.

106.    Furthermore, despite these indicia of fraud, upon information and belief, JPMC

did not inquire further.  Instead, in June 2007, JPMC proceeded to prepare a $600 million

proposal for additional investments in the Rye Funds and a $225 million proposal for

investments in Herald.

107.    Following these proposals, Coffman was anticipating "a major head on collision

with the business that wants to do an infinite amount of this activity with much less oversight."

A full "collision" did not seem to occur.  Concerns about potential fraud at BLMIS tempered

29

only the **amount** that JPMC was willing to risk with BLMIS feeder funds, but not the underlying decision to invest in those funds.

## Undeterred by Failed Due Diligence, Equity Exotics Requests Approval from the Hedge Fund Underwriting Committee to Issue Approximately $1 Billion in BLMIS-Related Products

108.   Seemingly unaffected by the alarming results of its limited due diligence inquiries, in June of 2007, Equity Exotics presented a proposal to the HFUC requesting approval of "an overall BLM Strategy risk limit" which would carry a maximum potential exposure of $1.32 billion.  This proposal included products ranging from $33 million to $667 million with eight different BLMIS feeder funds and sub-feeder funds, including the Rye Funds, Thema, Herald, Fairfield Sentry, Fairfield Sigma, Lagoon, and Rafale Partners.  The majority of the products were anticipated to come from transactions associated with the Rye Funds.  Despite asking to structure $667 million worth of products around the Rye Funds, Equity Exotics explained in the proposal that Tremont had "no internal risk system in place to aggregate positions daily."  Equity Exotics also stated, "we were unable to validate how this manual process [of checking trades] is performed, but feel reasonably confident that it is effective in terms of capturing major discrepancies."

109.   To be clear, Equity Exotics was not seeking approval to begin issuing products on BLMIS feeder funds.  Equity Exotics was asking for permission to continue issuing these products in ever larger amounts.  By the time Equity Exotics submitted this proposal, it had already executed over $130 million in trades based on Fairfield Sentry, Fairfield Sigma, and Lagoon.  With the June 2007 proposal, Equity Exotics was requesting approval to issue an additional billion dollars of structured products, an amount the group acknowledged was in "significant excess of both individual as well as aggregate single manager limits" for hedge fund investments at JPMC.

110.    The proposal was submitted with a certain sense of urgency.  At the time it was submitted, Equity Exotics had already arranged for $540 million worth of transactions to close at the end of June.

111.    On June 15, 2007, the HFUC met to consider the proposal.  On the very same day, Hogan shared with his colleagues what he had learned from Zames, that it was well-known that Madoff was operating a Ponzi scheme:  "For whatever its worth, I am sitting at lunch with Matt Zames who just told me that **there is a well-known cloud over the head of Madoff and that his returns are speculated to be part of a [P]onzi scheme**-he said if we google the guy we can see the articles for ourselves-Pls do that and let us know what you find."  (Emphasis added.)

112.    Hogan warned, "you will recall that Refco was also regulated by the same crowd [SEC, NYSE, NASD] and there was noise about them for years before it was discovered to be rotten to the core.  Hopefully this is not the case here but given Matt's view, I think we owe it to ourselves to investigate further."

113.    Nevertheless, Equity Exotics seemed eager to receive approval, and the further research on Madoff was limited to a Google search with no follow-up.  Buyers-Russo asked one of her colleagues to "please have one of the juniors look into this rumor about Madoff that Hogan refers to below."  The analyst forwarded an article about a proposed change in SEC regulations that would eliminate a loophole in the regulations governing broker-dealers.  He speculated the loophole allowed broker-dealers to run "a '[P]onzi' scheme of sorts."

114.    Even though the article made no mention of Ponzi schemes and provided no suggestion as to why Madoff in particular would have had a "well-known cloud" over his head, upon information and belief, no further investigation was conducted—even after Zames told Hernandez that he believed his recollection was of a Wall Street Journal article from 2002 and

31

therefore eliminated the possibility that the analyst's explanation based on a recently-proposed

regulatory change was correct.

115.    Again, Hogan cautioned, "Mr. Madoff will not allow us to conduct any due

diligence on him directly and we are forced to rely on the diligence of third parties. . . . I told

Bobby [Magee] and Neil [McCormick] we don't do $1 bio 'trust me' deals and we need to do

our own due diligence on Madoff or this wasn't going to happen."  However, the only further

"diligence" that appears to have been done was a phone call between Hogan and Madoff, which

reassured Hogan enough to permit $250 million worth of "trust me" deals.

116.    When asked how he made the decision to approve $250 million of exposure to

BLMIS, Hogan explained that, in essence, he simply closed his eyes and guessed:

> [T]here's no math or magic around it—you know, a lot of what we
> do is more art than science, so I would like to tell you that I have
> prepared a model that told me 250 is the optimum number, but—
> you know, that's not the way it works in reality, and so I just use
> my best judgment to come up with that number.

**The Investment Bank Continues to See Red Flags**

117.    For the remainder of 2007, Equity Exotics's enthusiasm for BLMIS-related

transactions remained strong despite uncovering additional red flags about BLMIS and BLMIS

feeder funds.

118.    In August 2007, while analyzing information provided by Herald, De Zordo noted

that despite T-bills rallying, "the move does not justify the magnitude of the gain that Bank

Medici is claiming."

119.    Equity Exotics also expressed skepticism about the information provided by

Fairfield, Lagoon, and Herald.  In November 2007, De Zordo and Nikolakopoulos were

organizing quarterly calls to funds to which JPMC had substantial exposure.  These funds

included Fairfield, Lagoon, and Herald.  When arranging meetings with these funds' managers,

Nikolakopoulos emphasized that they needed to meet with managers from all three funds in order to "assess what the returns where [sic] driven from and ensure we get a consistent answer from all three."

120.    Despite these concerns, JPMC remained loyal—the potential upside reward for investing through Madoff was simply too good to pass up even if there was a fraud.

121.    In March of 2008, JPMC acquired The Bear Stearns Companies Inc. ("Bear Stearns"). Bear Stearns's share price began to precipitously drop and the company began suffering from an extreme liquidity crunch in early March 2008. Unable to borrow enough funds to save itself, Bear Stearns started looking for outside options. On March 13, 2008, the CEO of Bear Stearns contacted Jamie Dimon, the Chairman and CEO of JPMC. By March 16, JPMC had entered into an agreement to purchase Bear Stearns. JPMC started integrating the two businesses almost immediately.

122.    The integration involved combining business units and risk exposures across JPMC and Bear Stearns. In acquiring Bear Stearns, JPMC had significantly increased its hedge fund exposure. In order to bring its hedge fund exposure back within JPMC's internal limits, JPMC began to review its exposure and look for places to make cuts. This reduction process prompted JPMC to revisit and reconsider certain hedge fund transactions, including its transactions involving BLMIS feeder funds.

123.    By June of 2008, JPMC had approximately $150 million invested in Herald. These were direct investments by JPMC in the fund, presumably to hedge the bank's exposure on its structured products tied to Herald's returns. When JPMC learned that its main contact at Bank Medici, Andreas Pirkner, was departing, JPMC scheduled a meeting with Pirkner, his replacement, Andreas Schindler, and a handful of other individuals from Bank Medici. This

meeting was crucial given JPMC's on-going struggle to get information from Bank Medici even with an established contact. The JPMC team, which included Palmer and Dixon, was sent to Vienna on July 7, 2008 to perform a "very thorough refresh" of its initial due diligence.

124. Following this meeting, JPMC downgraded Herald's risk rating to the lowest rating of "5-E." Palmer noticed aspects of Herald's operation that caused him to direct JPMC to verify that Herald's assets actually existed at BLMIS. In hopes of gaining more transparency on Bank Medici and BLMIS, JPMC scheduled a follow-up meeting with Kohn for July 10, 2008.

125. The meeting with Kohn proved to be equally disappointing for JPMC. Following this meeting, JPMC affirmed Herald's recently downgraded due diligence rating of 5-E. JPMC found that Kohn did not provide credible responses to a number of questions related to the managed accounts Bank Medici had with BLMIS. Given that Kohn was the only person at Bank Medici to have "any relationship of substance" with Madoff or BLMIS, it was incredibly troubling and telling that even she could not provide adequate responses to JPMC's questions.

126. The lack of credible responses JPMC received from BLMIS feeder funds in 2008 was reminiscent of the answers JPMC received in 2007. The only difference between JPMC's due diligence efforts in 2007 and 2008 was that, in 2008, JPMC continued to investigate. However, as it had the previous year, JPMC kept its findings a secret.

127. In September and October of 2008, in light of its increased hedge fund exposure in the wake of its acquisition of Bear Stearns and in view of the deteriorating economy, JPMC commenced an "exposure health check." This health check required JPMC to conduct broad due diligence on all BLMIS feeder funds in which it had invested or on which it had structured products. Palmer's team contacted the managers of Lagoon, Hermes, Fairfield Sentry, Fairfield Sigma, and Herald, as well as a number of fund custodians.

128.    Despite its previous investments in BLMIS-related funds, JPMC now urgently requested the following information:  (a) each BLMIS feeder fund's net asset value, both at the end of the first quarter and as of the date of the request; (b) any visible redemptions currently in the pipeline; (c) whether the fund's liquidity profile experienced any changes; (d) whether the fund's service providers experienced any changes or events, specifically at BLMIS; (e) whether BLMIS experienced any changes or events; (f) whether the account documents between BLMIS and its feeder funds had been modified in any way; and (g) the percentage of fund assets represented by structured products.  Upon information and belief, anticipating that a number of the BLMIS feeder funds would be less than forthcoming with information, JPMC requested the BLMIS feeder funds' availability for follow-up questions.

129.    JPMC was asking many of the same questions it had asked more than a year before.  Once again, JPMC was receiving incomplete answers.  The BLMIS feeder funds repeatedly found creative ways to dodge questions regarding their knowledge of BLMIS.

130.    FGG evaded answering questions about counterparties by stating that the funds were currently in T-bills, so there were not (at that particular point in time) any counterparties.

131.    When JPMC asked Bank Medici to provide risk reports in or around April 2008, Kohn agreed to share the reports.  However, nearly four months later, Kohn had not provided the reports and claimed that the parties needed to sign a confidentiality agreement first.  A confidentiality agreement was unnecessary, given that information from the risk reports would be communicated via JPMC's "Measure Risk."  Measure Risk, a leading risk and quantitative analytics provider to institutional hedge fund investors, maintained confidentiality by only providing JPMC with summary exposure and risk statistics.  The confidentiality attained by the

use of Measure Risk was explained to Bank Medici when it initially agreed to provide risk reports.

132.    Instead of continuing to be blinded by the potential reward of investing with BLMIS, this time, the JPMC due diligence team sought additional answers.  The team met with Kohn and Amit Vijayvergiya, the Head of Risk Management at FGG, in October 2008.  Following those meetings, Palmer circulated notes to his colleagues summarizing his findings.

133.    Palmer acknowledged:  "Fairfield claims to have seen the 19th floor [where Madoff executed the SSC Strategy] but judging from the lack of thoroughness of some of their other due diligence I am not entirely convinced that Madoff allowed them to actually enter the trading area."  When Palmer asked Vijayvergiya how BLMIS's trade information was put into the order entry system, Vijayvergiya told Palmer that "he did not know and did not ask."  These answers by Vijayvergiya revealed that BLMIS feeder funds knew very little about Madoff's operations, were extremely reluctant to push Madoff for answers, and, when they did get answers, upon information and belief, they never attempted to verify those responses with independent sources.

134.    This meeting also forced JPMC to again acknowledge the fact that none of the funds knew who the counterparties were to their own options contracts.  They relied solely on Madoff's oral assertions that he dealt with 15-25 counterparties, that he strictly monitored the risk level of each counterparty, and that the counterparties posted collateral for the put options.  Indeed, Vijayvergiya openly admitted that "Madoff refused to disclose the list of counterparties."  Vijayvergiya explained, "Madoff claimed that they did not want to disclose the list of counterparties because they are worried that if the list gets into the market that the counterparties would group together and either steal Madoff's strategy or otherwise somehow work against

Madoff." Kohn on the other hand, conceded that she had never even thought to ask Madoff who the counterparties were, and she was reluctant to ask him about it now.

135. JPMC was also reminded that BLMIS's auditor was Friehling—information it had had for years as BLMIS's banker. Palmer noted that this was an "odd choice" and questioned whether such a small firm was even competent to conduct an audit of an investment firm with "$650m in shareholder capital." Despite Palmer's surprise, this was not the first time that JPMC had access to such information. As early as 2006, Coffman conducted due diligence on Friehling and, in October 2007, one of JPMC's own investors had inquired about the identity of BLMIS's auditor. JPMC conducted no investigation beyond learning the names of BLMIS's auditor. Had JPMC looked further, it would have learned that Friehling was actually a three-person shop (and one of the three was retired or semi-retired) in a strip mall in Rockland County, New York—a **very** odd choice for a multi-billion dollar investment enterprise, and an indication of fraud.

136. JPMC was again told that there was no independent process for confirming the trades were executed or the assets existed. BLMIS acted as the sub-advisor, sub-custodian, and broker-dealer to the BLMIS feeder funds. The "reconciliation" process that occurred between the funds' actual custodians, the funds' administrators, and the funds themselves could be described as follows: "Effectively all three parties receive a faxed confirmation from Madoff of the day's positions/trades and enter them into their system. The reconciliation is thus effectively one of data entry integrity as there is no reconciliation of source data to third parties."

137. Palmer summarized his observations: "It's almost a cult [Madoff] seems to have fostered." Neither Kohn nor Vijayvergiya had been concerned by the lack of information Madoff provided. Rather, "they seem[ed] very defensive and almost scared of Madoff. They

seem[ed] unwilling to ask him any difficult questions and seem[ed] to be considering his 'interests' before those of the investors."

138.     JPMC's findings were especially troubling, given earlier that month in October 2008, Petters had been arrested under suspicion of operating a $3.5 billion Ponzi scheme.  Dixon, in response to Palmer's notes summarizing his meeting with Kohn and Vijayvergiya, drew parallels between Petters and Madoff.  He pointed out that they could not just rely on a long history and trust in an investment adviser, a mistake that investors with Petters were now regretting.  In the face of the Petters fraud, Dixon suggested, "Let's go see Friehling and Horowitz the next time we're in NY . . . to see that the address isn't a car wash at least."

139.     JPMC knew the critical questions to ask to avoid a situation like the Petters fraud. In fact, JPMC had asked such questions in 2007 and 2008.  Unfortunately, it was not until late 2008 that JPMC was willing to admit that "[t]he 'DD' done by all counterparties seems suspect."

140.     Further, JPMC's own due diligence in 2008 revealed:  (a) lack of transparency; (b) resistance on Madoff's part to provide meaningful disclosure; (c) involvement of Madoff's family throughout BLMIS; (d) lack of effective due diligence and monitoring by the BLMIS feeder funds; (e) fear of Madoff preventing investors from asking any serious questions as long as performance was strong; (f) lack of an independent and competent auditor; and (g) unanswered questions regarding BLMIS's trading, as no one outside of Madoff understood how it was done.

141.     These red flags were the same red flags JPMC discovered when it conducted its first round of due diligence more than a year before.  JPMC chose then to ignore the red flags, and instead continue to structure and issue products that facilitated an investment of approximately $250 million in BLMIS feeder funds.

142.    Again faced with these overwhelming indicia of fraud, Palmer belatedly suggested that it was a mistake for JPMC to "rely[] on Madoff's integrity (or Fairfield and Medici's belief in Madoff's integrity) and the quality of the due diligence work (initial and on-going) done by the custodians . . . to ensure that the assets actually exist and are properly custodied."  In an effort to provide some level of comfort to himself and fellow JPMC employees, Palmer noted that "if some[thing] were to happen with the funds, our recourse would be to the custodians and whether they had been negligent or grossly negligent."

**Faced Again with Numerous Indications of Madoff's Fraud, JPMC Quietly Removes All of Its Assets from the BLMIS Feeder Funds**

143.    In or about September 2008, a troubling conversation took place between Krueger and representatives of Aurelia Finance.  JPMC had sold its structured products to Aurelia Finance, who in turn had sold the products to its clients.  During the call, Krueger explained that JPMC was going to be redeeming from Lagoon.  The Aurelia Finance representatives repeatedly opposed JPMC's plan.  At two points in the conversation, the Aurelia Finance representatives made threats to Krueger, referring to "Colombian friends" who could "cause havoc" and telling Krueger "we know where to find you."

144.    As a result of this conversation, JPMC sent a document to SOCA conveying the substance of the threats.  As was reported in an October 7, 2010 article published in the French newspaper, L'Express, this document also explained why JPMC had chosen to redeem its interests in BLMIS feeder funds.  In essence, JPMC suspected BLMIS was not operating a legitimate business.

145.    In a letter to SOCA, JPMC's Vice President for the United Kingdom, Rebecca Smith, wrote:

> Ultimately, the bank reached the same conclusion it had reached
> during its initial due diligence efforts in 2006 and 2007;  JPMorgan

was unable to obtain lookthrough transparency at the Feeder Fund level, did not have access to the identities of the counterparties to Madoff's OTC options, did not fully understand the relationship between the broker-dealer and the investment advisor, and noted the fact that the custodians did not actually hold the assets.

146.    JPMC sent a Suspicious Activity Report to SOCA.  The document, dated October 28, 2008, reads:

> JPMCB's [an acronym for "JPMorgan Chase Bank"] concerns around Madoff Securities are based (1) on the **investment performance** achieved by its funds which is so **consistently and significantly ahead of its peers**, year-on-year, even in the prevailing market conditions, as to appear **too good to be true**— meaning that it probably is; and (2) the **lack of transparency** around Madoff Securities' trading techniques, **the implementation of its investment strategy**, and the **identity of its OTC option counterparties**; and (3) its unwillingness to provide helpful information.  **As a result, JPMCB has sent out redemption notices in respect of one fund, and is preparing similar notices for two more funds.**

(Emphasis added.)

147.    On or about October 10, 2008, JPMC submitted requests to redeem approximately $13 million from Fairfield Sentry and €15 million from Fairfield Sigma.  Later that month, JPMC requested redemptions totaling $154 million from Herald and an additional €72 million from Fairfield Sigma.

148.    JPMC also repeatedly rejected requests from clients to structure additional products during the Fall of 2008, each time relying on the fact that the funds at issue were invested with BLMIS.

149.    Following these redemptions, JPMC was careful not to discuss with third parties its redemptions from BLMIS-related products or its decision to cease any new involvement with BLMIS.  Instead, when approached by clients that had an interest in BLMIS-related products,

"[w]ithout disclosing too much, [JPMC] got rid of all the Madoff feeder[s]" from clients' lists of potential investments.

150.     In November 2008, Dixon stated, "only limited information has been historically available on anything related to Madoff.  We have done some work but this served only to reinforce the fact that we don't have enough access to Madoff to render independent judgment." As a result, JPMC was attempting to divest itself of all of its BLMIS-related investments.

151.     JPMC's exit strategy was successful.  By the time Madoff was arrested, JPMC had managed to redeem all but $35 million of its BLMIS feeder fund investments, due in large part to the fact that its request to redeem its shares of Lagoon in late November had not yet been satisfied.

152.     In redeeming its investments in the BLMIS-related funds, JPMC left itself fully exposed with regard to its structured products.  JPMC was still required to pay its investors based on the returns generated by the BLMIS feeder funds, which were generating positive returns while the market was down.  But for JPMC's suspicions about fraud at BLMIS, this move would have been counterintuitive.

153.     JPMC suspected BLMIS was a fraud and quietly pulled its money out.

**After the Fraud Was Revealed, JPMC Admitted Knowledge That Madoff Was a Fraud**

154.     In the immediate aftermath of Madoff's confession, JPMC made a number of disconcerting comments.  Palmer admitted Madoff's "[r]eturn seems a little too good to be true." The day of Madoff's arrest, McCormick stated,

> We've got a lot wrong this year but we got this one right at least—
> I said it looked too good to be true on that call with you in Sep.
> Despite suspecting it was dodgy I am still shocked to see this
> happen so suddenly.  I guess it's true that when the tide goes out
> you see who is swimming naked.

41

McCormick's criticisms of BLMIS were in stark contrast to comments he had made in June 2007 following Hogan's decision to execute $250 million of business across products referencing BLMIS. Upset that the amount approved was not higher, McCormick complained that "it sometimes feels very hard to make money."

155.    The comments continued as various individuals at JPMC stated matter-of-factly that it was "statistically impossible" for BLMIS to have generated 1.25% returns every month for years.

156.    Dixon admitted that he was not surprised to learn Madoff was a fraud. Additionally, Palmer admitted that the Madoff fraud "wasn't completely unexpected but the scale of it is still a shock."

157.    Even Hogan was relieved, noting that "Bobby F-ing Magee wanted to do $1bio of [BLMIS-related products] and we made it $200mio--thank God."

158.    Cox acknowledged that JPMC's limited documentation on Aurelia violated basic know your customer ("KYC") concepts:

> This document[ation] alone, irrespective of what's happen [sic], is probably a fireable offence based on my own KYC training.
>
> Marco told me last night he objected to dealing with Aurelia as there was no transparency, which maybe [sic] the reason for the statement in the document. I looked at Aurelia's website www.aurelia.com and they are prohibited from dealing with customers from US, UK, Switzerland and Bermuda. Now that's a red flag!

159.    Sankey best summarized JPMC's knowledge of the fraud and fear that JPMC's knowledge would be revealed following Madoff's arrest when he stated, in reference to the June 15, 2007 meeting agenda for the HFUC where Equity Exotics requested approval to increase JPMC's risk limit for BLMIS-related transactions to over $1 billion: "Perhaps best this never sees the light of day again!!"

160.    Despite having knowledge of, or at least making a conscious decision to try to avoid knowledge of, Madoff's fraud, JPMC chose to keep its knowledge private.  JPMC approached BLMIS feeder funds and asked for them to keep JPMC's redemptions quiet.  On December 17, 2008, Nikolakopoulos emailed FGG's Vijayvergiya to set up a call to discuss "[c]onfidentiality in relation to investments or disinvestments by JPMorgan and any of its affiliates in the two funds (FFG Sentry and Sigma)."

161.    JPMC took yet another self-congratulatory lap when it stated that while many of its Private Bank customers had invested with BLMIS "luckily we didn't place any there."

162.    Indeed, JPMC's Private Bank had made a conscious and informed decision to avoid doing business with Madoff.  Following the fraud, JPMC's Cembalest distributed an email to Private Bank clients that commented on the Madoff situation.  Cembalest told investors the Private Bank chose not to invest with any BLMIS feeder funds because it had "never been able to reverse engineer how they made money" and BLMIS "did not satisfy [their] requirement for administrative oversight."

163.    Cembalest provided a lengthy list of red flags that had informed the Private Bank's decision not to invest.  These red flags included:  (a) BLMIS served as its own prime broker, custodian, *and* investment adviser; (b) BLMIS utilized a three-person accounting firm in Rockland County, which was "almost unheard of for a fund of that size"; (c) while the BLMIS feeder funds were audited by large, well-known accounting firms, those audits did not cover BLMIS; (d) the Private Bank's due diligence team was not allowed to meet Madoff; (e) Madoff did not charge fees for his money management services (essentially leaving billions of dollars on the table); (f) BLMIS's volatility was only 2.5% over the preceding seventeen years, a period

which included some of the most volatile capital markets in history; and (g) Madoff's fund "lost money in only 2 of 214 rolling quarterly periods since 1990."

164.    Cembalest also noted his suspicion after hearing Madoff speak at a conference in October of 2007, where Madoff had stated:  "'In today's regulatory environment, it's virtually impossible to violate rules.'"  Cembalest concluded that this type of attitude was the reason "why hedge fund due diligence is more than just looking at volatility and return patterns."

165.    Cembalest conceded that these "Oz-like signals . . . were too difficult to ignore." Ironically, it was Cembalest's own company that did ignore those signals and silently allowed Madoff to launder billions for decades, as alleged in detail below.

### JPMC'S "LESSONS LEARNED"

166.    On December 19, 2008, JPMC's IBRC held a meeting at which Yang and Wise presented a "postmortem of the Madoff transactions."

167.    Yang's and Wise's presentation included a chronology of the events surrounding JPMC's investments in BLMIS.  They began by explaining how Equity Exotics had requested approval from the HFUC to increase JPMC's risk limit for BLMIS-related transactions to over $1 billion—a request which "far exceeded the IBRC approved single HF limit of $100mm." They then recounted how a conference call with Madoff had been arranged in an attempt to gather due diligence information, but during the call Madoff  "clearly expressed his dislike of doing structured products on his strategy and would not accommodate any direct due diligence on his firm."

168.    Both the positives and negatives of Equity Exotics's risk limit request were considered.  The postmortem prepared by JPMC in December 2008 stated the following:

Cons:    **[T]he lack of ability to do a full due diligence on Madoff itself**;

> **[T]he potential risk of fraud given the strategy was managed by Madoff in customer brokerage accounts**. This risk of fraud given the structure & set-up was correctly identified and flagged, but was considered at the time to be a remote likelihood given the Equity Exotics business sponsorship of the deal, sponsorship of Madoff by ICM and JPM's long standing (though limited) credit relationship with Madoff; and
>
> **Inability to reconcile Madoff's returns with ostensible strategy**; alpha generation dependent on "black box" timing model: Risk modeled the split strike conversion strategy, confirmed its benign market risk but could not replicate the fund returns and **suspected** that alpha may have been generated by **front-running** via the market-making.  Risk consequently request a background check—but nothing showed up.

(Emphasis added.)

169.    JPMC nevertheless approved Madoff exposure in the amount of $250 million—despite the strong risk of fraud and suspicions that Madoff was engaged in illegal front-running. JPMC redeemed most of its BLMIS -related investments before Madoff's arrest.  As of December 11, 2008, JPMC had only $35 million in risk exposure to BLMIS funds, having redeemed approximately $276 million from the BLMIS feeder funds.

170.    Yang's and Wise's presentation ended with a summary of lessons learned and red flags:

> Lessons Learned:    **How much to bank on reputation and SEC regulation:** Reliance on Madoff's long standing reputation, 40yr of [sic] track record and good standing as a regulated entity.  At what level of notional risk does the possibility of fraud at a private, unrated custodian outweigh the potential profitability of the transaction?
>
> Reliance on third party due diligence is insufficient and risky;
>
> More rigorous background check on Madoff could have revealed additional red flag such as the questionable auditor used by Madoff;

Fraud is possible even on an unprecedented scale and longevity; and

Having risk transparency, control over assets and liquidity via a managed account platform greatly mitigate fraud risk.

Red Flags:       **No Transparency:**  No transparency on the black box timing model implemented by Madoff;

**Unexplainable Returns:** Consistently smooth returns and low volatility appear too good to be true. . . . Risk had concern on whether Madoff's prop trading activities were appropriated [sic] Chinese Walled from its market making business;

**Secrecy and Exclusivity:**  No direct due diligence and mystique of exclusive relationship with long standing clients only.  Madoff's dislike of structured products;

**U[nu]sual Business Model:** commission based revenue instead of fee based revenue despite of the consistent double digital [sic] returns year over year;

**Restricted Information Access:** JPM could only review sample trade tickets and trading agreements with Madoff during onsite visit with access funds, but was not able to obtain written copies of these documents; and

**PPM Risk Disclosures:** fund assets are exposed to credit risk of the sub custodian and primer [sic] brokers.

171.    The December 19, 2008 meeting minutes indicated that "[g]iven the red flags and lessons learned, the group agreed that going forward we should not do business with any client or counterparty—either directly or indirectly—who will not provide basic due diligence, without exception."

**JPMC'S VIEW OF MADOFF AS SEEN FROM ACCOUNT ACTIVITY**

172.     JPMC was well-positioned to see fraudulent activity because JPMC had access to vast amounts of financial information about BLMIS.  JPMC had only to glance at the bizarre activity in the 703 Account to realize that Madoff was not using the account to operate a legitimate business.  But instead of reviewing the activity in the account and investigating the irregularities, JPMC allowed Madoff to move billions of dollars of stolen property in and out of the 703 Account for well over a decade.  At the same time, JPMC was collecting an estimated half a billion dollars in fee and interest payments.

**Madoff Finds a Banker to Assist Him in His Ponzi Scheme**

173.     In order to run his Ponzi scheme, Madoff needed a bank account to provide his customers with a sense that he was operating a legitimate investment advisory business.  Having a bank account would allow Madoff to receive customer investments and then transfer that money out of the account to perpetuate the Ponzi scheme.

174.     But this account would not look like a normal broker-dealer account—customer funds would be coming in, but those funds would not be segregated or transferred to separate sub-accounts.  In addition, the account would not show massive outflows to purchase securities or massive inflows when those securities were sold.

175.     Such unusual activity should not only have triggered an investigation by the banker in charge of the account, but it should also have triggered the bank's anti-money laundering ("AML") monitoring system.  Long before the passage of the USA Patriot Act in 2001 ("Patriot Act"), and with greater force after Congress passed the Patriot Act, banks such as JPMC were required to monitor their customers' transactions to detect and prevent money laundering and other suspicious activities.  The Patriot Act reinforced this obligation and underscored the importance of implementing robust detection systems.

176.     What Madoff needed was a bank that would be willing to look the other way, and would ignore any notifications from its AML monitoring system.

177.     Madoff found that bank.  JPMC was willing to ignore decades of suspicious and inexplicable activity in the 703 Account, even when its monitoring system alerted JPMC to unusual activity.  In return, JPMC received hundreds of millions of dollars in fees and profits from its relationship with Madoff.

**The Establishment of Madoff's Account**

178.     Madoff opened the 703 Account at Chemical Bank in 1986.  Chemical Bank went through a series of mergers and acquisitions, and ultimately became Chase Bank.  As the bank went through these transitions, Madoff's accounts stayed with it.

179.     Madoff used the 703 Account to serve the IA Business at BLMIS.  Because BLMIS initially operated as a sole proprietorship, the account was opened in Madoff's name.  In 2002, after BLMIS became a limited liability company, the account was placed in the name of BLMIS.

180.     BLMIS was assigned a relationship manager in the Broker/Dealer Group of the Investment Bank at JPMC.  In the mid-1990s, Cassa became BLMIS's relationship manager.  He managed the Broker/Dealer Group's relationship with BLMIS and Madoff, and was in charge of BLMIS's accounts, including the 703 Account.  When Cassa retired in March 2008, Mark Doctoroff took over as the Client Relationship Manager for BLMIS's accounts.

181.     Despite JPMC's own suspicions about Madoff, which culminated in a report to the British authorities, the 703 Account was still open and operating without any restrictions at the time of Madoff's arrest.

**JPMC Had a Duty to Know Its Customer and to Monitor Its Customers' Account Activity**

182.    Federal legislation and regulations have long required banks to have an AML

program.  One element of these programs is monitoring customer account activity in order to

detect possible fraud, money laundering, or other improper activity.  These requirements were

first established by the Bank Secrecy Act ("BSA") and federal banking regulations.  31 U.S.C. §

5311; 12 C.F.R. § 208.63.  All of the federal banking agencies have substantially identical

requirements.  Thus, those parts of JPMC under the supervision of the Office of the Comptroller

of the Currency ("OCC") would have the same obligations.  The Patriot Act reinforced these

obligations and underscored the importance of implementing robust detection systems to ensure

that money launderers and terrorists would not be able to use the United States financial system

to further their crimes.

183.    One purpose of these requirements is to ensure that banks, which are often in the

best position to identify potentially illegal activity, will closely observe the transactions taking

place in their clients' accounts.  The legislation and regulations also provide guidance to banks

and other financial institutions regarding how to best achieve that goal, and what actions to take

once suspicious activity is identified.

184.    Section 352 of the Patriot Act and the banking regulations require financial

institutions to institute an AML program that includes four pillars:  (1) designation of an

individual or individuals responsible for managing BSA compliance;  (2) a system of policies,

procedures, and internal controls to ensure ongoing compliance; (3) training for appropriate

personnel; and (4) independent testing of compliance.  12 C.F.R. § 208.63.

185.    Financial institutions must also fully understand the business in which their

customers are engaged.  This duty, referred to as the responsibility to "know your customer," is

critical to determining what activity was suspicious.  12 C.F.R. § 208.62.  Institutions viewing

account activity need a baseline against which to distinguish account activity that may be normal

for a particular industry from account activity that might suggest an illegal enterprise. The KYC

duty also pre-dated the Patriot Act. Not only was it suggested by such guidelines as the Federal

Reserve's BSA Examination Manual of 1995 and Supervisory Letter on Private Banking

Activities, SR 97-19 (SUP), but it was standard industry practice.

186.    This regulatory guidance directed financial institutions like JPMC to perform on-

site visits to their clients, obtain and review financial statements to corroborate the sources of the

clients' wealth, and to review media reports regarding their clients.

187.    It was also standard industry practice for financial institutions to perform KYC on

their clients. Many financial institutions have entire departments devoted to this one task and to

making sure KYC is performed thoroughly and is constantly monitored and recorded. JPMC has

a KYC department for each of its lines of business.

188.    While JPMC may have created AML and KYC programs that facially met the

requirements of the Patriot Act and related regulations, those programs were not effectively

executed.

**JPMC Had a Duty to Know What Type of Business Madoff Was Operating**

189.    The first step in identifying suspicious activity is for a bank to determine what its

clients' normal business activity would look like. Federal Financial Institutions Examination

Council BSA/AML Examination Manual of June 2005. This step can be accomplished in many

ways, including by meeting with the client and learning about the client's business, conducting

on-site due diligence visits to review the client's business operations, and reviewing the client's

financial statements.

190.    One of the ways in which banks discharge their KYC duty is by assigning a

sponsor to each account. The sponsor becomes the person in charge of ensuring the bank has

50

sufficient information about the client and the client's business to identify suspicious activity.

REDACTED

191.    The sponsor for the 703 Account through early 2008 was Cassa.  When asked about his duties as a client sponsor at his Rule 2004 bankruptcy examination, Cassa responded that **he did not even know what a client sponsor was**, much less that he was the sponsor for BLMIS's accounts.  He had received no training regarding his duties as a client sponsor and had taken no action to discharge those duties.  When shown a document in which he had recertified that he had performed his duties as a client sponsor, Cassa stated that he did not have any recollection of the duties of a sponsor or of the recertification process.

192.    JPMC utterly failed to "know its customer" when it came to Madoff and BLMIS. Shockingly, after decades of hosting BLMIS's checking account, Cassa, the client representative who had been in charge of the 703 Account for more than ten years, admitted, "I don't know what the checking account was used for."  He did not know whether it was used for market making activities, investment advisory services, both, or neither.

193.    Cassa did receive financial statements from BLMIS on a regular basis.  These statements included FOCUS Reports.  A quick review of those reports by JPMC would have revealed irregularities that required further investigation.

### *JPMC Ignored the Inconsistencies Between BLMIS's Financial Statements, the Activity in the 703 Account, and BLMIS's Purported Business*

194.    JPMC was in possession of at least fifteen regulatory filings of BLMIS, of which even a cursory review would have revealed numerous inconsistencies and falsehoods.  These reports included two annual audited financial statements ("Annual Audited Reports") and

thirteen quarterly FOCUS Reports, which report on periods between November 1, 2004 and

September 30, 2008.  Upon information and belief, Cassa began receiving quarterly FOCUS

Reports from BLMIS as early as October 2001.

195.    As a broker-dealer operating through 2008, BLMIS was required under SEC

Rule 17a-5 to file FOCUS Reports with the SEC.  These reports are basic financial and

operational reports that set forth, among other information, assets, liabilities, revenues, and

expenses of the company.

196.    In addition, under SEC Rule 17a-5(d), BLMIS was required to file Annual

Audited Reports.  These Annual Audited Reports must contain information about income, cash

flows, changes in stockholders', partners', or sole proprietors' equity, and changes in liabilities.

This statement is public, except where the statement of financial condition is bound separately

from the balance of the Annual Audited Reports, in which case the balance is deemed

confidential.

197.    Furthermore, when Equity Exotics began working with Cassa and the

Broker/Dealer Group to conduct due diligence on Madoff and BLMIS feeder funds in 2006 and

2007, Equity Exotics requested BLMIS FOCUS Reports as part of the due diligence they

conducted.

198.    Coffman specifically suggested that his team review the FOCUS Reports, stating

in February 2006 that JPMC "should assess quality and detail of regulatory FOCUS reports from

the firm.  They are not necessarily audited, but we derive comfort knowing that regulatory

reports are presented to and reviewed by SEC and exchanges, and firms can be penalized

significantly if statements prove to be fraudulent or inaccurate."

199.    In March 2006, Coffman stated again that JPMC should scan the FOCUS Reports

to ensure that BLMIS was not "another possible Refco."  The FOCUS Reports contained

numerous discrepancies and fraudulent statements suggesting that BLMIS was likely a fraud.

200.    On January 25, 2007, Cassa acknowledged receipt of the FOCUS Report for the

period of October 1, 2006 through December 31, 2006 ("December 2006 FOCUS Report").  The

December 2006 FOCUS Report revealed numerous inconsistencies and irregularities that should

have prompted further investigation of BLMIS by JPMC.

### The FOCUS Reports Show BLMIS Underreported Cash at JPMC

201.    Both the FOCUS Reports and Annual Audited Reports require broker-dealers to

list the amount of cash on hand at the broker-dealer, as well as all of its other assets and

liabilities.  The FOCUS Reports often did not show assets and liabilities that JPMC knew should

have been reported, including:  (a) cash held in JPMC accounts; (b) loans provided to BLMIS by

JPMC; and (c) related collateral on the loans JPMC extended to BLMIS.

202.    BLMIS consistently underreported the amount of cash it held on its FOCUS

Reports—a fact to which JPMC was privy by virtue of its maintenance of BLMIS's bank

accounts.  On an almost nightly basis, JPMC swept funds from the 703 Account into overnight

deposits.  Upon information and belief, for reporting purposes, the funds in the 703 Account and

the overnight deposits are considered "cash" and were visible to JPMC.  JPMC should have been

suspicious as to why the cash in the 703 Account and the overnight deposits often exceeded the

"cash" reported by BLMIS in its FOCUS Reports and Annual Audited Reports.

203.    For example, the December 2006 FOCUS Report listed $4,882,332 as the amount

of cash on hand.  As of December 31, 2006, the ending balance of the 703 Account was

$394,700 and the amount in overnight deposits was $295 million, totaling $295,394,700 of cash

on hand.  Thus, from the view of JPMC, there was a $290,512,368 difference between the

amount of cash BLMIS purported to have and the cash balances known to JPMC.  Thus, it was

readily apparent to JPMC that BLMIS was not reporting the full amount of cash it had on hand.

JPMC was uniquely positioned to discover and investigate this false statement by BLMIS

because it had access to the precise dollar amounts held in the 703 Account and overnight

deposits.

204.    BLMIS's underreporting of its cash position was not isolated to the December

2006 FOCUS Report.  In nearly every reporting period since December 31, 2006, BLMIS's

FOCUS Reports and Annual Audited Reports significantly underreported the amount of cash it

purported to hold, as compared to the amount it actually held in the 703 Account and in

overnight deposits.  JPMC was in possession of at least eight FOCUS Reports and two Audited

Annual Reports between December 2006 and September 2008, providing it with numerous

opportunities to discover that BLMIS was underreporting its cash position and making fraudulent

statements to the SEC.

### The FOCUS Reports Do Not Show JPMC's Loans to BLMIS

205.    Nor were irregularities and inconsistencies limited to the reporting of BLMIS's

cash position.  An entity filing a FOCUS Report must report "Bank loans payable."  JPMC made

a loan to BLMIS of $95 million in November 2005 that was not repaid until June 2006.  Yet the

FOCUS Report for the period ending December 2005 ("December 2005 FOCUS Report")—a

report in JPMC's possession—**reported that BLMIS had no bank loan obligations

outstanding.**  Based on its own information, JPMC knew this was false.

### The FOCUS Reports Underreport Loan Collateral

206.    BLMIS underreported its loan collateral, a fact also visible and known to JPMC.

The FOCUS Report must include "Securities and spot commodities owned at market value—

U.S. and Canadian government obligations" and "encumbered securities."  JPMC's November

2005 $95 million loan to BLMIS was collateralized by a $100 million Federal Home Loan Bank

Bond. BLMIS should have reported the bond as "Securities and spot commodities owned at

market value—U.S. and Canadian government obligations." **The amount reported on the**

**December 2005 FOCUS Report, $72,232,950, was less than the $100 million of the value of**

**the bond that JPMC knew BLMIS to be holding.** Moreover, the December 2005 FOCUS

Report should have listed the bond under "encumbered securities," which was left blank. Again,

on the basis of its own information, JPMC could determine that BLMIS was falsely reporting its

financial information.

### *The FOCUS Reports Show Glaring Issues in BLMIS's Purported Business*

207.     The FOCUS Reports and Annual Audited Reports revealed glaring

inconsistencies with the business in which BLMIS was purportedly engaged—a business that

JPMC was required to know as part of its KYC obligations. As the broker to its investment

adviser accounts, BLMIS was expected to report commission revenue. Prior to September 2006,

BLMIS did not record any commission revenue on the FOCUS Report "Commissions" revenue

line. Nor did BLMIS report commission revenue on its Annual Audited Reports prior to October

2006. JPMC was in possession of at least seven FOCUS Reports and Annual Audited Reports

filed prior to September 30, 2006, none of which listed any commission revenue. Even a cursory

review of the FOCUS Reports and Annual Audited Reports should have prompted an

investigation by JPMC.

208.     BLMIS registered with the SEC as an Investment Adviser in August 2006. The

FOCUS Reports and Annual Audited Reports filed by BLMIS after that time included amounts

listed for "Commissions." JPMC was in possession of at least nine FOCUS Reports and Annual

Audited Reports filed for periods including or after September 2006. Comparing the revenue

reported in the Annual Audited Reports for the fiscal years immediately before and after BLMIS

registered as an investment adviser demonstrates the significance of the newly reported

commission revenue. For the fiscal year ended 2005, BLMIS reported no commission revenue at

all. By contrast, for the fiscal year ended 2007, BLMIS reported $103,174,848 of commission

revenue which represented over 60% of total BLMIS revenues for the year. The sudden shift by

BLMIS to begin reporting commission revenue should have raised suspicions and prompted

further investigation by JPMC as part of its ongoing KYC duties. Instead, JPMC ignored blatant

misrepresentations in violation of its duties to monitor and understand the business of its

customers.

209. In the December 2006 FOCUS Report, BLMIS reported $23,921,497 as the

amount of commissions on transactions in exchange-listed securities executed on an exchange.

Other than commissions on transactions in exchange-listed securities, BLMIS disclosed no other

commission revenue on the December 2006 FOCUS Report. Specifically, BLMIS reported no

commission revenue for: (1) "Commissions on transactions in exchange listed equity securities

executed over-the-counter," (2) "Commissions on listed options transactions," and (3) "All other

securities commissions." As BLMIS's well-known trading strategy—of which JPMC was

familiar based on the 2006 investigation by Equity Exotics—consisted of trading S&P 100

equities and options, JPMC should have expected BLMIS to report commissions relating to

options, which it did not (whether they were listed or OTC).

210. The FOCUS Reports and Annual Audited Reports that were in JPMC's

possession did not reflect the activity that would be expected of a broker to its investment adviser

accounts. BLMIS's FOCUS Reports and Annual Audited Reports did not include: (a) customer

receivables, such as margin accounts; (b) customer payables, such as positive cash balances held

by BLMIS on behalf of customers; or (c) a computation for reserve requirements for customer

activity as required by the SEC under Rule 15c3-3, all of which would be reported by a broker-dealer with managed investment accounts.  The fact that BLMIS's financial reporting was entirely inconsistent with the business in which it was purportedly engaging was readily apparent to JPMC as a result of the FOCUS Reports, and should have been reviewed and investigated by JPMC as part of its ongoing KYC duties.

211.    For example, the December 2005 FOCUS Report had no amounts recorded under the captions "Receivables from customers" and "Payable to customers."  In addition, the credit and debit balance amounts in customer security accounts that form the basis for the computation for the Rule 15c3-3 reserve requirement were left blank.

212.    The failure to report financial information demonstrating customer activity was not isolated to the December 2005 FOCUS Report.  None of the FOCUS Reports and Annual Audited Reports in JPMC's possession—at least fifteen in total—included customer receivables or customer payables, and none included customer account balances in their computations for 15c3-3 reserve requirements.

213.    For all of the above reasons, the FOCUS Reports were glaringly misleading, which was obvious to others who reviewed them.  For example, shortly after Madoff's arrest, Robert Rosenkranz of Acorn Partners, a fund of funds manager and an investment adviser to high net worth individuals, reflected in an email that Acorn had performed due diligence on Madoff and concluded "that fraudulent activity was highly likely."  Specifically, the email stated that Acorn "reviewed the [BLMIS] audit report . . . which showed no evidence of customer activity whatsoever, neither accounts payables to or accounts receivables from customers."

214.    Acorn succinctly described the indicia of fraud that led it to conclude years prior that Madoff was a fraud.

We had considered investing in a Madoff managed account, and decided to pass for reasons that give a useful insight into our due diligence process.

First, we ascertained that the description of the strategy (purchase of large cap stocks versus sale of out of the money calls) appeared to be inconsistent with the pattern of returns in the track record, which showed no monthly losses.

Second, we persuaded a Madoff investor to share with us several months of his account statements with Madoff. These revealed a pattern of purchases at or close to daily lows and sales at or close to daily highs, which is virtually impossible to achieve. Moreover, the trading volumes reflected in the account (projected to reflect his account's share [of] Madoff's purported assets under management at the time) were vastly in excess of actually reported trading volumes.

Third, we noted that Madoff operated through managed accounts, rather than by setting up a hedge fund of his own. That was suspicious inasmuch as hedge fund fees are typically much higher than the brokerage commissions Madoff was meant to be charging. We suspected the requirement for annual hedge fund audits was the reason he wanted to avoid that approach. We knew that when his clients are audited, their auditors simply look at the account statements and transaction reports generated by the brokerage firm; they don't investigate the books of the brokerage firm itself.

Fourth, although brokerage firms are required to provide annual audit reports, the investor appeared not to have received any. With considerable perseverance, we obtained audit reports filed with the SEC, which were prepared by an utterly obscure accounting firm located in Rockland County New York.

Fifth, we reviewed the audit report itself, which showed no evidence of customer activity whatsoever, neither accounts payables to or accounts receivable from customers. They appeared to be the reports of a market maker, not of a firm that at the time was meant to have some $20 billion of customer accounts.

**Taken together, these were not merely warning lights, but a smoking gun.** The only plausible explanation we could conceive was that the account statements and trade confirmations were not bona fide but were generated as part of some sort of fraudulent or improper activity.

215.    All of the information flagged by Acorn through proper, independent, and reasonable due diligence, was information that was known by JPMC.  JPMC was in possession of the FOCUS Reports and Annual Audited Reports that it should have reviewed as part of its KYC and AML duties, as well as part of its due diligence process for its own investments linked to BLMIS.  Moreover, it had access to information not known to those such as Acorn—who reached the conclusion that BLMIS was likely fraudulent on far less information than was available to JPMC—as a result of JPMC's visibility into the 703 Account and its knowledge regarding its own lending activity with BLMIS.

216.    JPMC was in a unique position to uncover the many inconsistencies contained in the FOCUS Reports and Annual Audited Reports.  In dereliction of its duties, it ignored falsehoods that were readily apparent on the face of the FOCUS Reports and Annual Audited Reports, and in doing so, substantially assisted the Ponzi scheme.

**JPMC Had a Duty to Monitor BLMIS's Account Activity**

217.    Not only did JPMC fail to "know" BLMIS, but it also failed to identify and investigate activity that was suspicious regardless of whether JPMC thought BLMIS was using the 703 Account to operate a market making business, an investment advisory business, or any other legitimate enterprise.

218.    JPMC's AML policy created two avenues of transaction monitoring.

REDACTED

The transaction activity in BLMIS's account at JPMC could not have been linked to a legitimate business, a fact that should have been identified by both JPMC personnel and its automated monitoring system.

219.     JPMC was aware that BLMIS was operating at least two businesses:  a market making business and the IA Business.  But the activity in the 703 Account did not match up with either of these enterprises.

220.     If JPMC had believed Madoff was using the 703 Account for market making, the bank would have likely seen regular transactions with other brokerage firms with which BLMIS was trading.  If Madoff had been using the 703 Account for the IA Business, JPMC would have seen billions of dollars leaving the 703 Account and going to purchase stocks and equities, and corresponding multi-billion dollar inflows as BLMIS sold those securities.  In the interim, JPMC should have seen tens of billions of dollars—nearly all of the IA Business's assets under management—moved into T-bills, as that was part of BLMIS's purported investment strategy.

221.     Instead, what JPMC saw was massive outflows of money that were in no way linked to customer accounts or stock and options trading.  Money would come into the 703 Account as customers invested additional funds with BLMIS.  An overwhelming majority of funds would then go directly back out to customers in the form of redemptions.  Any balance that remained in the 703 Account was invested in short-term securities such as overnight sweeps, commercial paper, and certificates of deposit.

222.     JPMC also faced regular account activity that would have been suspicious regardless of the type of business JPMC thought Madoff was running.  The 2000 OCC BSA/AML Handbook identified numerous "red flags" that financial institutions needed to consider as part of their transaction monitoring procedures.  These red flags included:  (a) unexplained repetitive or unusual patterns of activity; (b) frequent large dollar transactions without corresponding explanations as to how those funds would be utilized; (c) spikes in customer activity with little or no explanation; and (d) wire activity with offshore banking

centers or financial secrecy havens.  The 703 Account exhibited all of these types of transactions, and exhibited them repeatedly.

223.    In addition, much of this account activity occurred between BLMIS and other JPMC customers.  Most notably, the party transacting with BLMIS most often and in the largest dollar amount, receiving almost $76 billion in payments from the 703 Account between December 1998 and September 2005, was JPMC's long-time Private Bank customer and IA Business customer, Norman Levy.

**Account Activity Red Flags**

224.    *Repetitive Transactions:*  BLMIS frequently engaged in repeated transactions with the same parties, often on the same days, with no obvious purpose.  For example, during 2002, BLMIS initiated outgoing transactions to Levy in the precise amount of $986,301 hundreds of times—318 separate times, to be exact.  These highly unusual transactions were often sent multiple times on a single day.

225.    As another example, from December 2001 to March 2003, the total monthly dollar amounts coming into the 703 Account from Levy were almost always equal to the total monthly dollar amounts going out of the 703 Account to Levy.  There was no clear economic purpose for such repetitive transactions that had no net impact on Levy's account at BLMIS.

226.    *Large Dollar Transactions:* The 703 Account reflected a pattern of large dollar transactions.  Between 1998 and 2008, BLMIS transferred $84 billion out of the 703 Account to just four customers.  These transactions represented over 75% of the wires and checks that flowed out of the 703 Account.  It also was typical for BLMIS, through the 703 Account, to enter into individual transactions with the BLMIS feeder funds for hundreds of millions of dollars.

227.    *Spikes in Activity:* The 703 Account showed occasional spikes in overall activity, which should have prompted further investigation by JPMC.  Shortly before the beginning of the

credit crisis, over the period beginning in the first quarter of 2006 and ending in the first quarter of 2007, there was a significant increase in the total dollar amount transacted in the 703 Account. This increase in activity included a significant increase not only in third party wires but also in book transfer activity. During this period, the average dollar amount of each transaction increased by over $60 million, from $17 million to $78 million.

228.    There was also a downward spike in activity between the 703 Account and Levy's account at the Private Bank after December 2001. In December 2001 alone, BLMIS engaged in approximately $6.8 billion worth of transactions with Levy. Shortly thereafter, Levy's activity with the 703 Account decreased dramatically.

229.    *Wire Activity with Offshore Entities:* Incredible spikes in the 703 Account's overall activity were accompanied by incredible spikes in offshore activity as well. Between 2004 and 2008, the dollar amount and volume of the 703 Account's international wire transfers with high and medium risk jurisdictions increased 83% and 67%, respectively.

230.    *Check Activity:* In addition, many transactions in the 703 Account involved hand-written checks totaling hundreds of millions of dollars in a single day. This is not only unusual on its face, but it is particularly unusual given that BLMIS would issue multiple checks on the same day to the same customer. At the very least, this activity should have prompted a check-kiting investigation, which undoubtedly would have revealed more suspicious behavior.

231.    In addition, the majority of Levy's transactions with the 703 Account were conducted by check. For example, in December 2001, the 703 Account received checks from Levy, each in the amount of $90 million, on a daily basis—a pattern of activity with no identifiable business purpose.

232.    *Private Banking:*  JPMC should have also been monitoring transactions from the perspective of certain JPMC customers that were also BLMIS customers.  A number of BLMIS customers held accounts at JPMC's Private Bank, including Levy.  Private banking has long been considered a high risk activity.  That is because private bank accounts generate lucrative fees, which provide an incentive for private bankers to ignore client activity that is illegal or violates internal bank policy.  Private banking has frequently served as a vehicle for money laundering, and particularly money laundering involving cross-border wire transfers.

233.    Thus, when JPMC saw billions of dollars of transfers between the 703 Account and accounts held at JPMC's Private Bank, it should have been highly suspicious.  Given that those accounts were held by JPMC, the bank was in a perfect position to investigate.  It had only to review its internal account records to determine whether there was a legitimate explanation for the transaction history.

234.    *Automated Account Monitoring:*  The 703 Account's unusual activity should have triggered JPMC's automated account monitoring system as well.              REDACTED

235.    JPMC's transaction monitoring system appears to have been critically flawed in that the formula JPMC programmed into the system failed to issue alerts even when analyzing highly suspicious activities.              REDACTED

However, even though the formula identified many instances of suspicious activity in the 703 Account, the system almost never issued alerts.  This prompted compliance

personnel at JPMC to ask, after Madoff's arrest, "Why didn't the DDA Account (xxxxx1703) alert . . . ?"

236.    Between June 2005 and September 2008,                    REDACTED

                                                                                            Yet,

during that period, only one account alert was generated.

237.    Taking March 2008 as an example, during that month there were approximately $1.1 billion in transactions in the 703 Account.  This value was so high        REDACTED



                                                    Remarkably, JPMC's transaction monitoring system noted the unusual activity but did not consider it unusual enough to warrant an alert.  No alert was generated in March 2008.

**JPMC Had a Duty to Investigate Suspicious Activity in BLMIS's Account**

238.    Once suspicious activity is identified, a bank must further investigate to determine whether there could be a legitimate explanation for the activity or, rather, if it is indicative of illegal activity.                    REDACTED



                Upon information and belief, in the face of repeated indications of suspicious transaction activity in the 703 Account, as well as comments from individuals within JPMC regarding the legitimacy of BLMIS's operations, JPMC never conducted any serious investigation of the activity in the 703 Account or filed a SAR with the United States government.

239.    Despite the frequency with which transactions in the 703 Account were far
outside the normal levels, the system issued only **a single account alert**.    REDACTED

240.                                   REDACTED

241.    Finally, the reviewer noted that he could not locate a KYC file for BLMIS and,
regardless, concluded the investigation.                    REDACTED

242.    Even when Zames raised the issue in 2007 that Madoff was operating a Ponzi
scheme, no one at JPMC appears to have looked at the transactions in the 703 Account, even
though it was a JPMC account.  BLMIS's Client Relationship Manager and account sponsor,
Cassa, learned of Zames's claim, but took no action whatsoever.

243.    Not only did JPMC have access to BLMIS's account history, but JPMC also had
access to the bank accounts of a number of BLMIS customers, and was thus provided with even
more information indicating fraud.  In fact, JPMC had an extremely close relationship with one
of BLMIS's largest and most active customers, Levy.

244.    Levy was a client of JPMC's Private Bank for over 64 years.  Levy had close
business relationships with senior executives at JPMC's predecessor banks, as well as at JPMC.

These individuals included William Harrison, Chief Executive Officer (succeeded by Jamie

Dimon), Walter Shipley, Chief Executive Officer from 1996 to 1999, and John McGillicuddy,

former Chairman and Chief Executive Officer of Manufacturers Hanover.  Levy was even

provided an office with the Private Bank group, which JPMC maintained for Levy even after the

Private Bank had relocated.

245.    Levy had two Premier Checking accounts with JPMC's Private Bank:  account

XXX-XXXX86 and account XXX-XXXX30.

246.    JPMC was acutely aware of Levy's close relationship with Madoff, identifying

Madoff as "Levy's close friend and trader," who had helped increase Levy's wealth from $180

million in 1986 to $1.5 billion in 1998.

247.    Upon information and belief, JPMC never meaningfully investigated the

connection between Madoff and Levy.  The activity in Levy's account confirmed that there was

no legitimate explanation for the suspicious transactions in the 703 Account.

248.    Instead of investigating these transactions, JPMC was primarily concerned about

maintaining a relationship with Levy and Madoff and maintaining a role in the Levy family's

finances after Levy's death in 2005.  Knowing that Madoff would be the executor of Levy's

estate after Levy's death, upon information and belief, JPMC prioritized its relationships with

Levy and Madoff over its compliance with regulations that required banks to monitor customer

accounts.

**JPMC Had a Duty to Take Action**

249.    Suspecting that illegal activity was occurring, JPMC had a duty to take action.

JPMC should have notified Madoff and then closed the account.

250.    Instead, JPMC took no action.  The 703 Account was still operating without any restrictions when Madoff was arrested on December 11, 2008.  Upon information and belief, JPMC did not convey its concerns to authorities or regulators other than SOCA.

## JPMC'S VIEW OF MADOFF THROUGH LOAN ACTIVITY

### JPMC's Loans to Levy for BLMIS Investments

251.    In addition to the activity in the 703 Account, red flags should have been raised for JPMC as a result of Madoff's suspicious loan activity, which involved Levy and another longtime friend of Madoff, Carl Shapiro.  However, as with all red flags surrounding Madoff's activity within the bank, JPMC willingly turned a blind eye.

252.    From at least 1996 through 2005, Levy and his children obtained credit facilities through JPMC and other banks, using funds borrowed under these credit lines to leverage investments with BLMIS.

253.    In 1996, for example, the same year Chemical Bank acquired The Chase Manhattan Bank, N.A., Levy had $188 million in outstanding loans, which he used to fund BLMIS investments.

254.    JPMC appropriately referred to these investments as "special deals."  Indeed, these deals were special for all involved:  (a) Levy enjoyed Madoff's inflated return rates of up to 40% on the money he invested through BLMIS; (b) Madoff enjoyed the benefits of large amounts of cash to perpetuate his fraud without being subject to JPMC's due diligence processes; and (c) JPMC earned fees on the loan amounts and watched the "special deals" from afar, escaping responsibility for any due diligence on BLMIS's operation.

255.    On the one hand, JPMC endorsed and helped fuel Levy's "special deals" with Madoff, continuously extending loans to Levy to finance these deals.  On the other hand, JPMC

advised the rest of its Private Bank customers not to invest with BLMIS—a fact made known to

JPMC's Private Banking customers after Madoff's arrest.

### JPMC's Loans to BLMIS in 2005 and 2006

256.    Shortly after Levy's death, JPMC began lending money directly to BLMIS, using

Federal Home Loan Bank Bonds extended to BLMIS from Shapiro as collateral.  JPMC

conducted an inadequate credit review before extending the loans, deciding instead to

immediately begin earning interest.

257.    In November 2005, JPMC requested approval for a fully collateralized $100

million broker loan for BLMIS.  Shortly thereafter, BLMIS borrowed $95 million from JPMC,

which as previously described, was not reported in the BLMIS FOCUS Reports.

258.    Enrica Cotellessa-Pitz, a Controller for BLMIS, requested the initial $95 million

on BLMIS's behalf in a letter sent to JPMC on November 14, 2005.  Prior to receiving the letter,

Daniel Bonventre, BLMIS's Head of Operations, had spoken with Evadney Sandiford in JPMC's

Broker/Dealer Group regarding BLMIS's large loan request.

259.    Cotellessa-Pitz requested that JPMC credit the 703 Account with the $95 million,

and use a bond in another account that BLMIS held with JPMC as collateral—account number

xx3414 ("Geoserve Account").

260.    The Geoserve Account contained a Federal Home Loan Bank Bond in the

principal amount of $100 million, due April 8, 2009.  According to JPMC's records, the $100

million bond was "receive[d] free" from Shapiro on November 4, 2005.

261.    The value of the bond was credited to a number of BLMIS IA Business accounts

held by Shapiro's family members, and, in addition, BLMIS paid Shapiro approximately 30%

interest on the bond.  BLMIS paid the interest quarterly, depositing the payments into various

accounts at JPMC held by Shapiro's family members.

262.    JPMC credited $95 million to the 703 Account on November 14, 2005—the same day Cotellessa-Pitz requested the funds.  JPMC immediately began to earn money off of the loan, collecting $198,081.60 in interest for November 2005, and $374,062.50 in interest for December 2005.

263.    Quickly thereafter, Bonventre, on BLMIS's behalf, requested an additional $50 million in a letter addressed to JPMC, dated January 18, 2006.  Similar to BLMIS's prior loan request, Bonventre directed JPMC to credit the 703 Account with the funds, using the bonds held in the Geoserve Account as collateral.

264.    That same day, on January 18, 2006, Bonventre sent an additional letter requesting JPMC to accept two more Federal Home Loan Bank Bonds into the Geoserve Account.  One bond was worth $9 million and the other was worth $45 million, together totaling $54 million.  As before, JPMC's records indicate that BLMIS received these bonds "free" from Shapiro, and BLMIS paid an annual interest rate of approximately 30% on the securities to various Shapiro family customer accounts at JPMC.  In response to Bonventre's requests, JPMC credited the 703 Account with $50 million on January 23, 2006.

265.    With the loan to BLMIS now increased by $50 million, JPMC began to collect even greater amounts in interest.  JPMC collected $443,689.23 for January 2006; $552,057.30 for February 2006; $620,781.25 for March 2006; $625,564.23 for April 2006; and $668,862.85 for May 2006.

266.    Having collected over $3.4 million in interest since BLMIS's initial loan request on November 14, 2005, JPMC stopped accumulating profits on June 1, 2006.  On that date, Madoff sent a letter to JPMC requesting a decrease in BLMIS's loan amount to zero, and

authorizing JPMC to debit the $145 million principal amount of the loan from the 703 Account.

JPMC did as Madoff requested, and debited $145 million from the 703 Account that same day.

267.    As with most of JPMC's due diligence regarding Madoff, JPMC failed to perform

an adequate credit review process prior to extending these loans to BLMIS.

268.    For instance, in a November 2005 credit memo that JPMC prepared requesting

approval for a fully collateralized $100 million broker loan for BLMIS, JPMC relied solely on

BLMIS's historical performance and Madoff's reputation in the community in finding comfort in

the exposure and concluding that BLMIS would be able to repay the loan.

269.    Moreover, in summarizing BLMIS's supposed financial stability in that

memorandum, Raffale Cardone, a credit officer at JPMC, stated that BLMIS's assets "are

comprised primarily of broker-dealer receivables and securities inventory."  Upon information

and belief, Cardone reached this conclusion by referencing BLMIS's unaudited financial

statements prepared by Friehling.

270.    Upon information and belief, JPMC failed again to rely on anything but BLMIS's

unaudited financial statements in its April 2006 credit memo, stating:  "As expected, [BLMIS's]

revenues were nearly entirely driven by trading income."

271.    Both credit memoranda's conclusions ran afoul of sound banking practices and

JPMC's own policies, which mandate that financial analyses of the borrowing customer be based

on audited financial statements.

272.    Furthermore, upon information and belief, JPMC's credit staff made no site visits

to observe BLMIS's operations.  Site visits are generally a requisite part of a sound credit review

process, designed to ensure that the lending institution has an adequate understanding of the

borrower's business operations.

273.    Once again, JPMC's failure to follow its internal policies and standard banking practices perpetuated Madoff's fraud at the expense of BLMIS's customers.

### JPMC ALLOWED THE FRAUD TO CONTINUE

> *"The Emperor felt very silly for he knew that the people were right but he thought, 'The procession has started and it must go on now!' So the Lords of the Bedchamber held their heads higher than ever and took greater trouble to pretend to hold up the train which wasn't there at all."*

Hans Christian Andersen, The Emperor's New Clothes

274.    Evidence of Madoff's fraud permeated every facet of JPMC. It ran from the Broker/Dealer Group, where BLMIS maintained a bank account that no one honestly could have believed was serving any legitimate purpose, to Equity Exotics, where JPMC learned of the red flags inherent in BLMIS's investment strategy, to JPMC's London office, which learned that individuals might be laundering money through BLMIS feeder funds, to the Private Bank, which maintained intimate relationships with one of BLMIS's largest customer, to Treasury & Security Services, which was responsible for investing the balance of the 703 Account in short-term securities.

275.    The various divisions of JPMC that were involved with BLMIS communicated with each other about BLMIS. When Equity Exotics wanted to set up a meeting with Madoff, and when the Risk Management Division needed to obtain BLMIS's financial documents, they knew to contact BLMIS's relationship manager in the Broker/Dealer Group. The Broker/Dealer Group also communicated with the Private Bank when customers at the Private Bank were interested in investing with Madoff, and with Treasury & Security Services when the relationship manager was trying to find new products that he could market to BLMIS.

276.    The various individuals and divisions of JPMC regularly interacted to gain additional information about business opportunities. But those channels were only utilized for

the purpose of increasing JPMC's fees and profits.  JPMC is liable for Madoff's fraud because it

was uniquely positioned for 20 years to see the fraud and put a stop to it.  Instead, it allowed the

"procession" to continue, and the fraud to continue unabated.

## THE TRANSFERS

### Direct Transfers to JPMC

277.    The Defendants received transfers directly and indirectly from BLMIS and

Madoff.  The Defendants received direct transfers from BLMIS and Madoff of, at a minimum, a

loan repayment, interest on loans, and account fees ("Initial Transfers").  Prior to the Filing Date,

BLMIS transferred at least $149,079,881.50 to the Defendants in the form of Initial Transfers,

including direct transfers during the ninety days preceding the Filing Date ("Preference Period

Initial Transfers"), during the two years preceding the Filing Date ("Two Year Initial

Transfers"), and during the six years preceding the Filing Date ("Six Year Initial Transfers").  A

chart showing the Initial Transfers of which the Trustee is currently aware is attached as Exhibit

A.

278.    The Preference Period Initial Transfers, Two Year Initial Transfers, and Six Year

Initial Transfers are avoidable and recoverable under §§ 544, 547, 548, 550(a), and 551 of the

Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and applicable

provisions of New York Civil Practice Law and Rules 203(g) and 213(8) and §§ 273-279 of the

New York Debtor and Creditor Law.

### Subsequent Transfers to the Defendants

279.    The Defendants also received fraudulent transfers from BLMIS indirectly when

they redeemed their interests in Fairfield Sentry, Fairfield Sigma, and Herald.

280.    Fairfield Sentry and Herald were BLMIS customers.  BLMIS transferred funds

directly to Fairfield Sentry when Fairfield Sentry made withdrawals from BLMIS.  Fairfield

Sentry then transferred those funds to the Defendants when the Defendants redeemed their interests in Fairfield Sentry in November 2008. In addition, BLMIS transferred funds directly to Herald when Herald made withdrawals from BLMIS. Herald then transferred those funds to the Defendants when the Defendants redeemed their interests in Herald.

281. Fairfield Sigma, on the other hand, did not have an account with BLMIS. Fairfield Sigma invested all of its funds in Fairfield Sentry. Thus, BLMIS transferred funds to Fairfield Sentry. Fairfield Sentry then transferred funds to Fairfield Sigma when Fairfield Sigma redeemed its interest in Fairfield Sentry. Fairfield Sigma then transferred those funds to the Defendants when the Defendants redeemed their interests in Fairfield Sigma in November 2008.

282. Upon information and belief, Fairfield Sentry and Herald received direct transfers from BLMIS during the 90 days preceding the Filing Date ("Preference Period BLMIS Customer Transfers"), during the two years preceding the Filing Date ("Two Year BLMIS Customer Transfers"), and during the six years preceding the Filing Date ("Six Year BLMIS Customer Transfers"). The Preference Period BLMIS Customer Transfers, Two Year BLMIS Customer Transfers, and Six Year BLMIS Customer Transfers (collectively "BLMIS Customer Transfers") are avoidable and recoverable under §§ 544, 547, 548, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and applicable provisions of New York Civil Practice Law and Rules 203(g) and 213(8) and §§ 273-279 of the New York Debtor and Creditor Law.

283. The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and Herald to avoid and to recover the BLMIS Customer Transfers.

284. The Trustee incorporates by reference the complaints filed in the following actions: *Picard v. Fairfield Sentry Ltd.*, No. 09-01239 (BRL) (Bankr. S.D.N.Y. filed May 18,

2009) (Amended Complaint filed July 20, 2010) (Dkt. No. 23), and *Picard v. Herald Fund SPC*,

No. 09-01359 (BRL) (Bankr. S.D.N.Y. filed July 14, 2009) (Second Amended Complaint filed

October 13, 2009) (Dkt. No. 24).  Charts showing the BLMIS Customer Transfers of which the

Trustee is currently aware for Fairfield Sentry and Herald are attached as Exhibits B and C,

respectively.  A chart showing the subsequent transfers from Fairfield Sentry to Fairfield Sigma

of which the Trustee is currently aware is attached as Exhibit D.

285.    Some or all of the BLMIS Customer Transfers were then transferred to the

Defendants when they redeemed their interests in Fairfield Sentry, Fairfield Sigma, and Herald.

These payments to the Defendants constitute subsequent transfers of the avoidable BLMIS

Customer Transfers ("Subsequent Transfers").

286.    The portion of the Preference Period BLMIS Customer Transfers that was

subsequently transferred to the Defendants will be referred to as the "Preference Period

Subsequent Transfers."  The portion of the Two Year BLMIS Customer Transfers that was

subsequently transferred to the Defendants will be referred to as the "Two Year Subsequent

Transfers."  The portion of the Six Year BLMIS Customer Transfers that was subsequently

transferred to the Defendants will be referred to as the "Six Year Subsequent Transfers."  Prior to

the Filing Date, JPMC received at least $167,530,580.09 and €87,052,875.00, totaling

approximately $276,346,673.84, in Subsequent Transfers.  A chart showing the Subsequent

Transfers of which the Trustee is currently aware is attached as Exhibit E.

287.    The Preference Period Subsequent Transfers, Two Year Subsequent Transfers,

and Six Year Subsequent Transfers, or the value thereof, are recoverable from the Defendants

pursuant to § 550(a) of the Bankruptcy Code.

288.    The Defendants knew or should have known of fraudulent activity in connection

with the transfers they received directly or indirectly from BLMIS and Madoff and/or that the

transfers might have been made for a fraudulent purpose.

289.    To the extent that any of the recovery counts may be inconsistent with each other,

they are to be treated as being pled in the alternative.

290.    The Trustee's investigation is on-going and the Trustee reserves the right to

amend and (i) supplement the Complaint, including but not limited to, information on the Initial

Transfers, Subsequent Transfers, and any additional transfers, and (ii) seek recovery of

additional transfers and damages.

## CAUSES OF ACTION

291.    The Trustee alleges each cause of action against each and every Defendant.

### AS AND FOR A FIRST CAUSE OF ACTION
### Preferential Transfers (Initial Transferee)—11 U.S.C. §§ 547(b), 550(a), and 551

292.    The Trustee repeats and realleges allegations 1 through 291, as though fully

realleged herein.

293.    At the time of each of the Preference Period Initial Transfers, the Defendants were

"creditors" of BLMIS within the meaning of § 101(10) of the Bankruptcy Code and pursuant to

SIPA § 78fff-2(c)(3).

294.    Each of the Preference Period Initial Transfers constitutes a transfer of an interest

of BLMIS in property within the meaning of § 101(54) of the Bankruptcy Code and pursuant to

SIPA § 78fff-2(c)(3).

295.    Each of the Preference Period Initial Transfers was to or for the benefit of the

Defendants.

296.    Each of the Preference Period Initial Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

297.    Each of the Preference Period Initial Transfers was made while BLMIS was insolvent.

298.    Each of the Preference Period Initial Transfers was made during the 90-day preference period under § 547(b)(4) of the Bankruptcy Code.

299.    Each of the Preference Period Initial Transfers enabled the Defendants to receive more than they would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) the Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

300.    Each of the Preference Period Initial Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to § 547(b) of the Bankruptcy Code and recoverable from the Defendants as initial transferees or the entities for whose benefit such transfers were made pursuant to § 550(a) of the Bankruptcy Code.

301.    As a result of the foregoing, pursuant to §§ 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Preference Period Initial Transfers; (b) directing that the Preference Period Initial Transfers be set aside; and (c) recovering the Preference Period Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR A SECOND CAUSE OF ACTION
### Fraudulent Transfers (Initial Transferee)—11 U.S.C. §§ 548(a)(1)(A), 550(a), and 551

302.    The Trustee repeats and realleges allegations 1 through 301, as though fully realleged herein.

303.    Each of the Two Year Initial Transfers was made on or within two years before the Filing Date.

304.    Each of the Two Year Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

305.    Each of the Two Year Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.  BLMIS made the Two Year Initial Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

306.    Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to § 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Defendants pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

307.    As a result of the foregoing, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers be set aside; and (c) recovering the Two Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR A THIRD CAUSE OF ACTION
### Fraudulent Transfers (Initial Transferee)—11 U.S.C. §§ 548(a)(1)(B), 550(a), and 551

308.    The Trustee repeats and realleges allegations 1 through 307, as though fully realleged herein.

309.    Each of the Two Year Initial Transfers was made on or within two years before the Filing Date.

310.    Each of the Two Year Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

311.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Initial Transfers.

312.    At the time of each of the Two Year Initial Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Initial Transfers.

313.    At the time of each of the Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

314.    At the time of each of the Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

315.    Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to § 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Defendants pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

316.    As a result of the foregoing, pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers be set aside; and (c) recovering the Two Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR A FOURTH CAUSE OF ACTION

### Fraudulent Transfers (Initial Transferee)—New York Debtor and Creditor Law §§ 276, 276-a, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551

317.    The Trustee repeats and realleges allegations 1 through 316, as though fully realleged herein.

318.    At all times relevant to the Six Year Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

319.    Each of the Six Year Initial Transfers constitutes a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

320.    Each of the Six Year Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Initial Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

321.    Each of the Six Year Initial Transfers was received by the Defendants with the actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Six Year Initial Transfers, and/or future creditors of BLMIS.

322.    As a result of the foregoing, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; (c) recovering the Six Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from the Defendants.

### AS AND FOR A FIFTH CAUSE OF ACTION
***Fraudulent Transfers (Initial Transferee)—New York Debtor and Creditor Law §§ 273, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551***

323.    The Trustee repeats and realleges allegations 1 through 322, as though fully realleged herein.

324.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

325.    Each of the Six Year Initial Transfers constitutes a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

326.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

327.    BLMIS was insolvent at the time it made each of the Six Year Initial Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six Year Initial Transfers.

328.    As a result of the foregoing, pursuant to §§ 273, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR A SIXTH CAUSE OF ACTION
***Fraudulent Transfers (Initial Transferee)—New York Debtor and Creditor Law §§ 274, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551***

329.    The Trustee repeats and realleges allegations 1 through 328, as though fully realleged herein.

330.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

331.    Each of the Six Year Initial Transfers constitutes a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

332.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

333.    At the time BLMIS made each of the Six Year Initial Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Initial Transfers was an unreasonably small capital.

334.    As a result of the foregoing, pursuant to §§ 274, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR A SEVENTH CAUSE OF ACTION
*Fraudulent Transfers (Initial Transferee)—New York Debtor and Creditor Law §§ 275, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551*

335.    The Trustee repeats and realleges allegations 1 through 334, as though fully realleged herein.

336.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

337.    Each of the Six Year Initial Transfers constitutes a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

338.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

339.    At the time BLMIS made each of the Six Year Initial Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

340.    As a result of the foregoing, pursuant to §§ 275, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
*Recovery of All Fraudulent Transfers (Initial Transferee)—New York Civil Practice Law and Rules 203(g) and 213(8), New York Debtor and Creditor Law §§ 276, 276-a, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551*

341.    The Trustee repeats and realleges allegations 1 through 340, as though fully realleged herein.

342.    At all times relevant to the Initial Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

343.    At all times relevant to the Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

344.    Each of the Initial Transfers constitutes a conveyance by BLMIS as defined § 270 of the New York Debtor and Creditor Law.

345.    Each of the Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Initial Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

346.    Each of the Initial Transfers was received by the Defendants with the actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

347.    As a result of the foregoing, pursuant to New York Civil Practice Law and Rules 203(g) and 213(8), §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; (c) recovering the Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from the Defendants.

### AS AND FOR A NINTH CAUSE OF ACTION
### Preferential Transfers (Subsequent Transferee)—11 U.S.C. §§ 547(b), 550(a), and 551

348.    The Trustee repeats and realleges allegations 1 through 347, as though fully realleged herein.

349.    At the time of each of the Preference Period BLMIS Customer Transfers, Fairfield Sentry and Herald were each a "creditor" of BLMIS within the meaning of § 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

350.    Each of the Preference Period BLMIS Customer Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of § 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

351.    Each of the Preference Period BLMIS Customer Transfers was to or for the benefit of Fairfield Sentry or Herald.

352.    Each of the Preference Period BLMIS Customer Transfers was made for or on account of an antecedent debt owed by BLMIS to Fairfield Sentry and Herald before such transfer was made.

353.    Each of the Preference Period BLMIS Customer Transfers was made while BLMIS was insolvent.

354.    Each of the Preference Period BLMIS Customer Transfers was made during the 90-day preference period under § 547(b)(4) of the Bankruptcy Code.

355.    Each of the Preference Period BLMIS Customer Transfers enabled Fairfield Sentry or Herald to receive more than each would receive if:  (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) such transferees received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

356.    Each of the Preference Period BLMIS Customer Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to § 547(b) of the Bankruptcy Code.

357.    The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and Herald to avoid the Preference Period BLMIS Customer Transfers pursuant to § 547(b) of the Bankruptcy Code, and to recover the Preference Period BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code.

358.    The Defendants were immediate or mediate transferees of some portion of the

Preference Period BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code (as

defined earlier, "Preference Period Subsequent Transfers").

359.    Each of the Preference Period Subsequent Transfers was made directly or

indirectly to or for the benefit of the Defendants.

360.    As a result of the foregoing, pursuant to §§ 547(b), 550(a), and 551 of the

Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the

Preference Period Subsequent Transfers, or the value thereof, from the Defendants for the benefit

of the estate of BLMIS.

**AS AND FOR A TENTH CAUSE OF ACTION**
***Fraudulent Transfers (Subsequent Transferee)***
***11 U.S.C. §§ 548(a)(1)(A), 550(a), and 551***

361.    The Trustee repeats and realleges allegations 1 through 360, as though fully

realleged herein.

362.    The Two Year BLMIS Customer Transfers were made on or within two years

before the Filing Date.

363.    Each of the Two Year BLMIS Customer Transfers constitutes a transfer of an

interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy

Code and pursuant to SIPA § 78fff-2(c)(3).

364.    Each of the Two Year BLMIS Customer Transfers was made by BLMIS with the

actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.

BLMIS made the Two Year BLMIS Customer Transfers to or for the benefit of Fairfield Sentry

or Herald in furtherance of a fraudulent investment scheme.

365.    Each of the Two Year BLMIS Customer Transfers constitutes a fraudulent

transfer avoidable by the Trustee pursuant to § 548(a)(1)(A) of the Bankruptcy Code and

85

recoverable from Fairfield Sentry or Herald pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

366.    The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and Herald to avoid the Two Year BLMIS Customer Transfers pursuant to § 548(a)(1)(A) of the Bankruptcy Code, and to recover the Two Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

367.    The Defendants were immediate or mediate transferees of some portion of the Two Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code (as defined earlier, "Two Year Subsequent Transfers").

368.    Each of the Two Year Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

369.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the Two Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
#### Fraudulent Transfers (Subsequent Transferee)
#### 11 U.S.C. §§ 548(a)(1)(B), 550(a), and 551

370.    The Trustee repeats and realleges allegations 1 through 369, as though fully realleged herein.

371.    The Two Year BLMIS Customer Transfers were made on or within two years before the Filing Date.

372.    Each of the Two Year BLMIS Customer Transfers constituted a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

86

373.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year BLMIS Customer Transfers.

374.    At the time of each of the Two Year BLMIS Customer Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year BLMIS Customer Transfers.

375.    At the time of each of the Two Year BLMIS Customer Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

376.    At the time of each of the Two Year BLMIS Customer Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

377.    Each of the Two Year BLMIS Customer Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to § 548(a)(1)(B) of the Bankruptcy Code and recoverable from Fairfield Sentry or Herald pursuant to § 550(a) and SIPA § 78fff-2(c)(3).

378.    The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and Herald to avoid the Two Year BLMIS Customer Transfers pursuant to § 548(a)(1)(B) of the Bankruptcy Code, and to recover the Two Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

379.    The Defendants were immediate or mediate transferees of some portion of the Two Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code (as defined earlier, "Two Year Subsequent Transfers").

380.    Each of the Two Year Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

381.     As a result of the foregoing, the Trustee is entitled to a judgment pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), recovering the Two Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR A TWELFTH CAUSE OF ACTION
### Fraudulent Transfers (Subsequent Transferee)—New York Debtor and Creditor Law §§ 276, 276-a, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551

382.     The Trustee repeats and realleges allegations 1 through 381, as though fully realleged herein.

383.     At all times relevant to the Six Year BLMIS Customer Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

384.     Each of the Six Year BLMIS Customer Transfers constitutes a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

385.     The Six Year BLMIS Customer Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year BLMIS Customer Transfers to or for the benefit of Fairfield Sentry or Herald in furtherance of a fraudulent investment scheme.

386.     Each of the Six Year BLMIS Customer Transfers was received by Fairfield Sentry or Herald with the actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Six Year BLMIS Customer Transfers, and/or future creditors of BLMIS.

387.     The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and Herald to avoid the Six Year BLMIS Customer Transfers pursuant to § 544 of the Bankruptcy Code, and §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, and to

recover the Six Year BLMIS Customer Transfers and attorneys' fees pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

388.   The Defendants were immediate or mediate transferees of some portion of the Six Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code (as defined earlier, "Six Year Subsequent Transfers").

389.   Each of the Six Year Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

390.   Each of the Six Year Subsequent Transfers was received by the Defendants with the actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Six Year Subsequent Transfers, and/or future creditors of BLMIS.

391.   As a result of the foregoing, the Trustee is entitled to a judgment pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Six Year Subsequent Transfers, or the value thereof, and attorneys' fees from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR A THIRTEENTH CAUSE OF ACTION
*Fraudulent Transfers (Subsequent Transferee)—New York Debtor and Creditor Law §§ 273, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551*

392.   The Trustee repeats and realleges allegations 1 through 391, as though fully realleged herein.

393.   At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

394.    Each of the Six Year BLMIS Customer Transfers constitutes a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

395.    BLMIS did not receive fair consideration for the Six Year BLMIS Customer Transfers.

396.    BLMIS was insolvent at the time it made each of the Six Year BLMIS Customer Transfers or, in the alterative, BLMIS became insolvent as a result of each of the Six Year BLMIS Customer Transfers.

397.    The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and Herald to avoid the Six Year BLMIS Customer Transfers pursuant to § 544 of the Bankruptcy Code, and  §§ 273, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the Six Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78ff-2(c)(3).

398.    The Defendants were immediate or mediate transferees of some portion of the Six Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code (as defined earlier, "Six Year Subsequent Transfers").

399.    Each of the Six Year Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

400.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to §§ 273, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Six Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
### *Fraudulent Transfers (Subsequent Transferee)—New York Debtor and Creditor Law §§ 274, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551*

401.    The Trustee repeats and realleges allegations 1 through 400, as though fully reavailed herein.

402.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

403.    Each of the Six Year BLMIS Customer Transfers constituted a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

404.    BLMIS did not receive fair consideration for the Six Year BLMIS Customer Transfers.

405.    At the time BLMIS made each of the Six Year BLMIS Customer Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year BLMIS Customer Transfers was an unreasonably small capital.

406.    The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and Herald to avoid the Six Year BLMIS Customer Transfers pursuant to § 544 of the Bankruptcy Code, and §§ 274, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the Six Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

407.    The Defendants were immediate or mediate transferees of some portion of the Six Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code (as defined earlier, "Six Year Subsequent Transfers").

91

408. Each of the Six Year Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

409. As a result of the foregoing, the Trustee is entitled to a judgment pursuant to §§ 274, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Six Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR A FIFTEENTH CAUSE OF ACTION
### Fraudulent Transfers (Subsequent Transferee)—New York Debtor and Creditor Law §§ 275, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551

410. The Trustee repeats and realleges allegations 1 through 409, as though fully realleged herein.

411. At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

412. Each of the Six Year BLMIS Customer Transfers constitutes a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

413. BLMIS did not receive fair consideration for the Six Year BLMIS Customer Transfers.

414. At the time BLMIS made each of the Six Year BLMIS Customer Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

415. The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and Herald to avoid the Six Year BLMIS Customer Transfers pursuant to § 544 of the Bankruptcy Code, and §§ 275, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the

Six Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code and SIPA

§ 78fff-2(c)(3).

416.    The Defendants were immediate or mediate transferees of some portion of the Six

Year BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code (as defined

earlier, "Six Year Subsequent Transfers").

417.    Each of the Six Year Subsequent Transfers was made directly or indirectly to, or

for the benefit of, the Defendants.

418.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to

§§ 275, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551

of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Six Year Subsequent Transfers,

or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### AS AND FOR A SIXTEENTH CAUSE OF ACTION
*Recovery of All Fraudulent Transfers (Subsequent Transferee)—New York Civil Practice Law and Rules 203(g) and 213(8), New York Debtor and Creditor Law §§ 276, 276-a, 278, and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551*

419.    The Trustee repeats and realleges allegations 1 through 418, as though fully

realleged herein.

420.    At all times relevant to the BLMIS Customer Transfers, the fraudulent scheme

perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of

BLMIS.

421.    At all times relevant to the BLMIS Customer Transfers, there have been one or

more creditors who have held and still hold matured or unmatured unsecured claims against

BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not

allowable only under § 502(e) of the Bankruptcy Code.

422.    Each of the BLMIS Customer Transfers constitutes a conveyance by BLMIS as defined in § 270 of the New York Debtor and Creditor Law.

423.    The BLMIS Customer Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the BLMIS Customer Transfers to or for the benefit of Fairfield Sentry or Herald in furtherance of a fraudulent investment scheme.

424.    Each of the BLMIS Customer Transfers was received by Fairfield Sentry or Herald with the actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the BLMIS Customer Transfers, and/or future creditors of BLMIS.

425.    The Trustee has filed lawsuits against Fairfield Sentry, Fairfield Sigma, and Herald to avoid the BLMIS Customer Transfers pursuant to § 544 of the Bankruptcy Code, New York Civil Practice Law and Rules 203(g) and 213(8), §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

426.    The Defendants were immediate or mediate transferees of some portion of the BLMIS Customer Transfers pursuant to § 550(a) of the Bankruptcy Code (as defined earlier, "Subsequent Transfers").

427.    Each of the Subsequent Transfers was made directly, or indirectly to, or for the benefit of, the Defendants.

428.    Each of the Subsequent Transfers was received by the Defendants with the actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Subsequent Transfers, and/or future creditors of BLMIS.

429.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to New York Civil Practice Law and Rules 203(g) and 213(8), §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS and recovering attorneys' fees from the Defendants.

### AS AND FOR A SEVENTEENTH CAUSE OF ACTION
### Aiding and Abetting Fraud

430.    The Trustee repeats and realleges allegations 1 through 429, as though fully realleged herein.

431.    Madoff, through his IA Business, committed a massive fraud.  The Defendants had actual knowledge of the fraud and lent substantial assistance to Madoff and BLMIS in committing the fraud.  At a minimum, the Defendants consciously avoided knowledge of the fraud.  The Defendants suspected BLMIS was a fraud and realized there was a high probability BLMIS was a fraud, but refrained from confirming it, in order to later deny knowledge of the fraud.  The Defendants' actions proximately caused the fraud that resulted in billions in damages to BLMIS's customers.

432.    The Trustee brings this claim against all Defendants because, upon information and belief, each Defendant, individually, aided and abetted the fraud.  In addition, all of the Defendants operated as a single, indivisible entity.  Therefore, each of the Defendants is liable for the actions of the other Defendants.

433.    Through BLMIS, Madoff committed one of the largest frauds in history.  Madoff told BLMIS's customers that he would invest their money pursuant to the SSC Strategy, but

instead stole that money and never purchased any securities.  The Ponzi scheme has resulted in

billions of dollars in losses to BLMIS's customers.

434.    The Defendants knew, or at least consciously avoided knowledge, of the fraud.

The Defendants knew since at least the 1990s that the transactions taking place in the 703

Account did not coincide with any legitimate enterprise, and thus could only be explained by

fraud.  In December 2001, the Defendants were aware of what appeared to be a check-kiting

scheme between BLMIS and Levy, involving BLMIS's sending checks to Levy in the same

amount daily.  The Defendants were also aware of highly suspicious activity in the 703 Account,

including:  large, repetitive transactions; up and down spikes in the value and volume of

transactions; frequent transactions with offshore entities; the regular use of hand-written checks

for millions of dollars; and suspicious activity between the 703 Account and clients of the

Private Bank, including Levy.  No later than January 2007, the Defendants' automated

transaction monitoring system alerted the Defendants as to this unusual activity.

435.    The Defendants were aware since at least 2004 that BLMIS submitted false

information to the SEC.  The FOCUS Reports BLMIS provided to the Defendants contained

glaring inaccuracies.  The Defendants knew or should have known the information in the

statements dramatically misstated BLMIS's cash on hand and that the reports showed no

evidence of any customer accounts.

436.    After performing minimal due diligence on BLMIS and the BLMIS feeder funds,

the Defendants knew Madoff was engaging in fraud.  Since at least 2006, the Defendants knew,

among other things, that:  BLMIS's returns were "too good to be true" and could not be

reconciled with market conditions; there was a lack of transparency surrounding BLMIS,

including that BLMIS feeder funds would not give the Defendants access to their account

agreements with BLMIS; and BLMIS's auditor was unregistered and was not subject to peer review.

437.    Since at least 2007, the Defendants knew, among other things, that:  Madoff did not want anyone to perform due diligence on BLMIS; Madoff would not tell the BLMIS feeder funds the names of the counterparties to the options transactions BLMIS was purportedly entering into on their behalf; there was no independent verification of the trades BLMIS was supposedly executing for its customers; there was no verification that any of BLMIS's customers' assets existed; BLMIS was rumored to be a Ponzi scheme or engaged in illegal front-running; there were similarities between BLMIS and the Refco fraud; and the Defendants were receiving inconsistent answers from the BLMIS feeder funds in response to their questions about BLMIS.  No later than 2007, the Defendants acknowledged there was a substantial risk that BLMIS was a fraud.

438.    Since at least 2008, and prior to Madoff's arrest, the Defendants knew, among other things, that:  certain BLMIS feeder funds refused to answer the Defendants' questions about BLMIS and Madoff; there were similarities between BLMIS and the Petters fraud; and Madoff's family members had critical roles at BLMIS.  No later than September 2008, the Defendants learned that Aurelia Finance, an entity linked to one of the BLMIS feeder funds in which the Defendants had invested, was likely engaged in illegal activity relating to a BLMIS feeder fund.

439.    In October 2008, the Defendants admitted that the information they learned no later than 2006 led them to believe that BLMIS was a fraud.  It was this concern that led the Defendants to submit requests to redeem their interests in the BLMIS feeder funds in October

2008.  After Madoff's arrest, individuals employed by the Defendants admitted that they were
not surprised to hear Madoff was operating a Ponzi scheme.

440.    The Defendants knew BLMIS was a fraud.  At a minimum, the Defendants were
repeatedly faced with evidence that there was a high probability BLMIS was a fraud, and made a
conscious decision not to confirm that fact.

441.    The Defendants substantially assisted Madoff and BLMIS in committing the fraud
by:  funneling approximately $250 million into BLMIS by way of the Defendants' investments
in BLMIS feeder funds; lending BLMIS and Madoff hundreds of millions of dollars without
which the Ponzi scheme could not have continued; lending Levy, one of BLMIS's largest
customers, hundreds of millions of dollars that Levy then invested with BLMIS, without which
the Ponzi scheme would have collapsed; allowing Madoff to use the 703 Account to run his
Ponzi scheme; executing transfers at Madoff's behest and honoring hand-written checks for tens
of millions of dollars that were necessary for the operation of the Ponzi scheme; providing short-
term investment vehicles that generated revenue necessary for the continuation of the Ponzi
scheme; choosing not to execute its AML policy, which it touted to its customers, by effectively
failing to provide an account sponsor to the 703 Account; ignoring over ninety instances of
irregular activity in the 703 Account, and dismissing the one alert that was issued in January
2007; providing unsupervised Private Bank accounts to some of BLMIS's biggest customers;
and ignoring false statements made by BLMIS in its regulatory filings.

442.    The Defendants' assistance was a proximate cause of the fraud.  Without the
Defendants' assistance, Madoff would not have been able to continue to operate his Ponzi
scheme for over two decades.

443.     As a result of the Defendants' aiding and abetting Madoff's fraud, BLMIS's customers lost billions of dollars.  At a minimum, the Defendants' actions resulted in customers losing approximately $5.4 billion between December 2004 and December 2008.

### AS AND FOR AN EIGHTEENTH CAUSE OF ACTION
### Aiding and Abetting Breach of Fiduciary Duty

444.     The Trustee repeats and realleges allegations 1 through 443, as though fully realleged herein.

445.     BLMIS owed a fiduciary duty to its customers. BLMIS breached that fiduciary duty by perpetrating a massive Ponzi scheme and stealing billions of dollars from its customers. JPMC knowingly participated in the breach, causing harm to BLMIS's customers. At a minimum, the Defendants consciously avoided knowledge of the breach.  The Defendants suspected BLMIS was breaching its fiduciary duty and realized there was a high probability BLMIS was breaching its fiduciary duty, but refrained from confirming it, in order to later deny knowledge of the breach.

446.     The Trustee brings this claim against all Defendants because, upon information and belief, each Defendant, individually, aided and abetted the breach of fiduciary duty by BLMIS.  In addition, all of the Defendants operated as a single, indivisible entity.  Therefore, each of the Defendants is liable for the actions of the other Defendants.

447.     BLMIS was in a fiduciary relationship with its customers.  BLMIS was in a superior position over its customers, which required those customers to repose trust and confidence in BLMIS.  In addition, pursuant to various account agreements BLMIS's customers executed, BLMIS agreed to take its customers' money and invest it pursuant to the SSC Strategy. Instead, Madoff took their money and used it to benefit himself and others close to him.

448.    The Defendants knew BLMIS had a fiduciary duty to its customers and that

BLMIS breached that duty.  The Defendants were aware that BLMIS was a broker-dealer and an

investment adviser, and had reviewed account agreements in which BLMIS agreed to invest

customers' money pursuant to specific terms.

449.    The Defendants also knew, or at least consciously avoided the knowledge that,

BLMIS breached that fiduciary duty by engaging in fraud.  The Defendants knew since at least

the 1990s that the transactions taking place in the 703 Account did not coincide with any

legitimate enterprise, and thus could only be explained by fraud.  In December 2001, the

Defendants were aware of what appeared to be a check-kiting scheme between BLMIS and

Levy, involving BLMIS's sending checks to Levy in the same amount daily.  The Defendants

were also aware of highly suspicious activity in the 703 Account, including:  large, repetitive

transactions; up and down spikes in the value and volume of transactions; frequent transactions

with offshore entities; the regular use of hand-written checks for millions of dollars; and the

suspicious activity between the 703 Account and clients of the Private Bank, including Levy.  No

later than January 2007, the Defendants' automated transaction monitoring system alerted the

Defendants to this unusual activity.

450.    The Defendants were aware since at least 2004 that BLMIS submitted false

information to the SEC.  The FOCUS Reports BLMIS provided to the Defendants contained

glaring inaccuracies.  The Defendants knew or should have known the information in the

statements dramatically misstated BLMIS's cash on hand and that the reports showed no

evidence of any customer accounts.

451.    After performing minimal due diligence on BLMIS and the BLMIS feeder funds,

the Defendants knew Madoff was engaging in fraud.  Since at least 2006, the Defendants knew,

among other things, that: BLMIS's returns were "too good to be true" and could not be

reconciled with market conditions; there was a lack of transparency surrounding BLMIS,

including that BLMIS feeder funds would not give the Defendants access to their account

agreements with BLMIS; and BLMIS's auditor was unregistered and was not subject to peer

review.

452.    Since at least 2007, the Defendants knew, among other things, that: Madoff did

not want anyone to perform due diligence on BLMIS; Madoff would not tell the BLMIS feeder

funds the names of the counterparties to the options transactions BLMIS was purportedly

entering into on their behalf; there was no independent verification of the trades BLMIS was

supposedly executing for its customers; there was no verification that any of BLMIS's

customers' assets existed; BLMIS was rumored to be a Ponzi scheme or engaged in illegal front-

running; there were similarities between BLMIS and the Refco fraud; and the Defendants were

receiving inconsistent answers from the BLMIS feeder funds in response to their questions about

BLMIS. No later than 2007, the Defendants acknowledged there was a substantial risk that

BLMIS was a fraud.

453.    Since at least 2008, and prior to Madoff's arrest, the Defendants knew, among

other things, that: certain BLMIS feeder funds refused to answer the Defendants' questions

about BLMIS and Madoff; there were similarities between BLMIS and the Petters fraud; and

Madoff's family members had critical roles at BLMIS. No later than September 2008, the

Defendants learned that Aurelia Finance, an entity linked to one of the BLMIS feeder funds in

which the Defendants had invested, was likely engaged in illegal activity relating to a BLMIS

feeder fund.

454.    In October 2008, the Defendants admitted that the information they learned no later than 2006 led them to believe that BLMIS was a fraud.  It was this concern that led the Defendants to submit requests to redeem their interests in the BLMIS feeder funds in October 2008.  After Madoff's arrest, individuals employed by the Defendants admitted that they were not surprised to hear Madoff was operating a Ponzi scheme.

455.    The Defendants knew BLMIS was breaching its fiduciary duty to its customers.  At a minimum, the Defendants were repeatedly faced with evidence that there was a high probability BLMIS was breaching its fiduciary duty, and made a conscious decision not to confirm that fact.

456.    The Defendants participated in, and provided substantial assistance to, BLMIS's breach of its fiduciary duty by:  funneling approximately $250 million into BLMIS by way of the Defendants' investments in BLMIS feeder funds; lending BLMIS and Madoff hundreds of millions of dollars without which the Ponzi scheme could not have continued; lending Levy, one of BLMIS's largest customers, hundreds of millions of dollars that Levy then invested with BLMIS, without which the Ponzi scheme would have collapsed; allowing Madoff to use the 703 Account to run his Ponzi scheme; executing transfers at Madoff's behest and honoring hand-written checks for tens of millions of dollars that were necessary for the operation of the Ponzi scheme; providing short-term investment vehicles that generated revenue necessary for the continuation of the Ponzi scheme; choosing not to execute its AML policy, which it touted to its customers, by effectively failing to provide an account sponsor to the 703 Account; ignoring over ninety instances of irregular activity in the 703 Account, and dismissing the one alert that was issued in January 2007; providing unsupervised Private Bank accounts to some of BLMIS's biggest customers; and ignoring false statements made by BLMIS in its regulatory filings.

457.    The Defendants' assistance was a proximate cause of the breach.  Without the Defendants' assistance, Madoff would not have been able to continue to operate his Ponzi scheme for over two decades.

458.    As a result of the Defendants' aiding and abetting this breach of fiduciary duty, BLMIS's customers lost billions of dollars.  At a minimum, the Defendants' actions resulted in customers losing approximately $5.4 billion between December 2004 and December 2008.

### AS AND FOR A NINETEENTH CAUSE OF ACTION
#### Conversion

459.    The Trustee repeats and realleges allegations 1 through 458, as though fully realleged herein.

460.    BLMIS customers have the possessory right and interest to the billions of dollars they personally invested with BLMIS.

461.    All of the money invested with BLMIS was ultimately deposited into the 703 Account.  JPMC was the bank responsible for servicing and maintaining the 703 Account.

462.    By virtue of servicing and maintaining the 703 Account, JPMC was required to monitor BLMIS's banking activities.  It was this obligation that led JPMC to uncover a number of red flags indicating that Madoff was engaging in fraud in 2007, if not earlier.

463.    Although a number of these red flags were largely ignored, in 2008, JPMC confirmed that BLMIS was engaging in a massive fraud.  Despite this knowledge, JPMC continued to provide BLMIS with banking services and watched as additional monies from unknowing customers flowed into the 703 Account, further perpetuating Madoff's Ponzi scheme.

464.    Upon learning that BLMIS was engaging in fraud, JPMC intentionally exercised dominion and control over BLMIS customers' money in a manner inconsistent with and in willful disregard of their interests by failing to discontinue banking services to a known fraud.

This failure by JPMC allowed BLMIS to continue to lure unsuspecting customers, with the additional money flowing into the 703 Account resulting in fees and profits for JPMC.

465.    JPMC's failure to discontinue banking services has resulted in the wrongful conversion of BLMIS customers' specifically identifiable funds.  JPMC is therefore liable to BLMIS customers for having wrongfully converted these monies and is now obligated to return all such monies.

### AS AND FOR A TWENTIETH CAUSE OF ACTION
### Unjust Enrichment

466.    The Trustee repeats and realleges allegations 1 through 465, as though fully realleged herein.

467.    JPMC has been unjustly enriched.  JPMC has wrongfully and unconscionably benefited from the receipt of stolen money from BLMIS, for which it did not in good faith provide fair value.  Rather, JPMC received these monies only as a result of perpetuating and participating in a fraudulent scheme.

468.    JPMC benefitted greatly from its involvement in Madoff's fraud.  JPMC earned an estimated $500 million in fees and profits from its banking activity and investments dealing with Madoff and BLMIS.  Furthermore, JPMC debited $145 million from the 703 Account in June 2006, purportedly in repayment of its loans.  JPMC also redeemed approximately $276 million in investments.  However, these transfers necessarily were taken at the expense of all of BLMIS's customers.  None of this money has been returned to the Trustee so that he may distribute it to Madoff's customers.  It all remains with the very financial institution that could have exposed Madoff as a fraud years before he was arrested.

469.    As described above, JPMC was constantly faced with evidence that BLMIS was a fraud.  For example, JPMC was privy to the abnormal activity in the 703 Account, suspicious

and inadequate information received from BLMIS feeder funds while conducting due diligence in anticipation of structuring and issuing products, and a plethora of other red flags, as set forth above.

470.    JPMC helped perpetuate Madoff's fraud by ignoring the red flags, and continuing to structure products and collect fees for their own enrichment.

471.    Faced with the prospect of losing fees and profits, JPMC chose to ignore compelling evidence of Madoff's fraud.  As a result, it has pocketed nearly a billion dollars that rightfully belong to BLMIS's customers.  JPMC has been enriched at the expense of the Trustee and, ultimately, at the expense of BLMIS's customers.

472.    Equity and good conscience require full restitution of the monies received by JPMC, directly and indirectly, from BLMIS.  This includes not only the money itself that JPMC received, but also the proceeds of that money.  Any profits and fees earned with the money they received must be returned to the Trustee.

### AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
#### Fraud on the Regulator

473.    The Trustee repeats and realleges allegations 1 through 472, as though fully realleged herein.

474.    JPMC engaged in fraud on the regulator when it failed to report irregularities in the 703 Account activity, and failed to report suspicious activity to United States government authorities, at a minimum, in the Fall of 2008, when it made such a report to SOCA.

475.    Well prior to 2008, JPMC had a duty to report suspicious activity and failed to do so in the face of repeated indicia of fraud or other illegal activity, such as money laundering and front-running.

476.    During this time, as set forth in detail above, JPMC ignored inconsistencies between BLMIS's financial statements, the activity in the 703 Account, and BLMIS's purported business.

477.    In addition, JPMC failed to report any of the repetitive transactions, spikes in activity, and unusual check activity in the 703 Account, including the activity between BLMIS and Levy in December 2001—suspicious activity constituting approximately $6.8 billion worth of transactions and conducted primarily through checks.

478.    Moreover, BLMIS's FOCUS Reports underreported cash at JPMC and loan collateral, did not reflect loans extended by JPMC to BLMIS in 2005 and 2006, and showed glaring issues in BLMIS's purported business.  Yet, still, JPMC reported nothing to authorities.

479.    The irregularities in BLMIS's financial statements and suspicious and inexplicable activity in the 703 Account were not the only red flags prior to 2008 that should have prompted reports to governmental authorities.

480.    While investigating various BLMIS feeder funds in 2007 for the purpose of structuring its own financial products based on those funds, Hogan informed colleagues at JPMC "that [Madoff's] returns are speculated to be part of a [P]onzi scheme."  Even though Hogan recognized at that time that such comments were worthy of additional investigation, JPMC failed to conduct an adequate investigation and did not report these suspicions.

481.    JPMC's failure to adequately monitor the 703 Account and report suspicious activity proximately caused the Ponzi scheme to thrive.  But for JPMC's willingness to turn a blind eye to the fraud and other illegal activity they suspected or knew to exist, the Ponzi scheme would have been discovered sooner, and BLMIS's customers would not have been harmed to the extent they were.

482. JPMC is therefore liable to BLMIS for its complicity in the fraud for at least $5.4 billion, with the exact amount to be determined at trial.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

    i. On the First Claim for Relief, pursuant to §§ 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Preference Period Initial Transfers; (b) directing that the Preference Period Initial Transfers be set aside; and (c) recovering the Preference Period Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

    ii. On the Second Claim for Relief, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers be set aside; and (c) recovering the Two Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

    iii. On the Third Claim for Relief, pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers be set aside; and (c) recovering the Two Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

iv.  On the Fourth Claim for Relief, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; (c) recovering the Six Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from the Defendants;

v.  On the Fifth Claim for Relief, pursuant to §§ 273, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

vi.  On the Sixth Claim for Relief, pursuant to §§ 274, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

vii.   On the Seventh Claim for Relief, pursuant to §§ 275, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

viii.  On the Eighth Claim for Relief, pursuant to New York Civil Practice Law and Rules 203(g) and 213(8), §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; (c) recovering the Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from the Defendants;

ix.   On the Ninth Claim for Relief, pursuant to §§ 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the Preference Period Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

x.   On the Tenth Claim for Relief, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the Two Year Subsequent Transfers, or

the value thereof, from the Defendants for the benefit of the estate of

BLMIS;

xi.   On the Eleventh Claim for Relief, pursuant to §§ 548(a)(1)(B), 550(a), and

551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is

entitled to a judgment recovering the Two Year Subsequent Transfers, or

the value thereof, from the Defendants for the benefit of the estate of

BLMIS;

xii.   On the Twelfth Claim for Relief, pursuant to §§ 276, 276-a, 278, and/or

279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and

551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is

entitled to a judgment recovering the Six Year Subsequent Transfers, or

the value thereof, and attorneys' fees from the Defendants for the benefit

of the estate of BLMIS;

xiii.   On the Thirteenth Claim for Relief, pursuant to §§ 273, 278, and/or 279 of

the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a

judgment recovering the Six Year Subsequent Transfers, or the value

thereof, from the Defendants for the benefit of the estate of BLMIS;

xiv.   On the Fourteenth Claim for Relief, pursuant to §§ 274, 278, and/or 279 of

the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a

judgment recovering the Six Year Subsequent Transfers, or the value

thereof, from the Defendants for the benefit of the estate of BLMIS;

xv.   On the Fifteenth Claim for Relief, pursuant to §§ 275, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the Six Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

xvi.   On the Sixteenth Claim for Relief, pursuant to New York Civil Practice Law and Rules 203(g) and 213(8), §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS, and recovering attorneys' fees from the Defendants;

xvii.   On the First through Sixteenth Claims for Relief, pursuant to common law and New York Civil Practice Law and Rules 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Subsequent Transfers were received by JPMC;

xviii.   On the Seventeenth, Eighteenth, Nineteenth, Twentieth, and Twenty-First Claims for Relief, compensatory, exemplary, and punitive damages of approximately $6 billion, with the specific amount to be determined at trial;

xix.   Establishment of a constructive trust over the proceeds of the Initial Transfers, Subsequent Transfers, and unjust enrichment to JPMC in favor of the Trustee for the benefit of BLMIS's estate;

111

xx.  Awarding the Trustee all applicable interest, costs, and disbursements of

this action; and

xxi.  Granting the Trustee such other, further, and different relief as the Court

deems just, proper, and equitable.

Dated:  New York, New York
       December 2, 2010

/s Deborah H. Renner
Baker & Hostetler LLP
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Deborah H. Renner
Email:  drenner@bakerlaw.com
Keith R. Murphy
Email:  kmurphy@bakerlaw.com
Seanna R. Brown
Email:  sbrown@bakerlaw.com
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated
SIPA Liquidation of Bernard L. Madoff
Investment Securities LLC and Estate of
Bernard L. Madoff*

and

Jessie M. Gabriel
Email:  jgabriel@bakerlaw.com
Jennifer A. Vessells
Email:  jvessells@bakerlaw.com
Lauren M. Hilsheimer
Email:  lhilsheimer@bakerlaw.com
Lindsey D'Andrea
Email:  ldandrea@bakerlaw.com

*Of Counsel*:

Mark A. Kornfeld
Email:  mkornfeld@bakerlaw.com
Oren J. Warshavsky
Email:  owarshavsky@bakerlaw.com
Gonzalo S. Zeballos
Email:  gzeballos@bakerlaw.com
Timothy Scott Pfeifer
Email:  tpfeifer@bakerlaw.com
Marc Skapof
Email:  mskapof@bakerlaw.com

Capitol Square, Suite 2100
65 East State Street
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616